Ian S. Dooley
Erin Colón
Erik Grafe
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: idooley@earthjustice.org
E: ecolon@earthjustice.org
E: egrafe@earthjustce.org

*Attorneys for Plaintiffs Sovereign Iñupiat for a Living Arctic et al.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC *et al.*,<br><br>       *Plaintiffs*,<br><br>       v.<br><br>DOUG BURGUM *et al.*,<br><br>       *Defendants*. | Case No. 3:25-cv-00356-SLG |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 1

ARGUMENT ....................................................................................................................... 5

I.     Plaintiffs are likely to succeed on the merits. ....................................................... 5

      A.     Plaintiffs have standing. .............................................................................. 5

      B.     BLM's reliance on ROP C-2 is arbitrary. ................................................. 6

            1.     BLM must mitigate impacts to tundra and assure maximum protection. ...................................................................................... 7

            2.     BLM does not explain how ROP C-2 protects tundra under actual snow conditions, and thus BLM's determination that impacts would be minor and temporary is arbitrary. ........................ 8

            3.     The record shows ROP C-2's six-inch snow depth standard fails to prevent impacts from tundra travel. ................................... 11

            4.     ROP C-2 fails to include specific measures to avoid impacts from seismic camp moves. ............................................................. 12

      C.     BLM failed to evaluate or apply measures that would have avoided impacts from tundra travel activities. ......................................................... 13

II.    Plaintiffs will suffer irreparable harm without an injunction. ................................. 15

      A.     The exploration program will likely cause population-level harm to the Teshekpuk Caribou herd. ......................................................................... 16

            1.     Displaced caribou eat less, give birth less, and survive less, leading to population-level harm. ..................................................... 16

            2.     The Teshekpuk Caribou Herd is increasingly vulnerable in winter. ...................................................................................... 17

            3.     The Willow development is likely causing population-level harm, and the exploration program will expand that harm. ............. 18

4. Population-level harm to the Teshekpuk Caribou Herd will irreparably harm plaintiffs' ability to obtain subsistence food. ....... 19

B. The exploration program will irreparably harm the Teshekpuk Lake and Colville River Special Areas. ................................................... 20

III. The balance of harms tips sharply in plaintiffs' favor. ........................................... 21

IV. A preliminary injunction advances the public interest. ........................................... 22

CONCLUSION ........................................................................................... 23

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS .......................................... 24

# TABLE OF AUTHORITIES

## Cases

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127, 1138 (9th Cir. 2011) .......................................................... 22

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .............................................................................. 15, 21

*District of Columbia v. U.S. Dep't of Agric.*,
444 F.Supp.3d 1 (D.D.C. 2020) ........................................................... 16, 20

*Ecological Rights Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ...................................................................... 6

*Haskins v. Stanton*,
794 F.2d 1273 (7th Cir. 1986) .................................................................... 20

*Indigenous Env't Network v. United States Dep't of State*,
369 F.Supp.3d 1045 (D. Mont. 2018) ......................................................... 22

*League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ...................................................................... 22

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 22

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
463 U.S. 29 (1983) .......................................................................... 6, 7, 14

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001) ...................................................................... 22

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ...................................................................... 15

*Native Vill. of Quinhagak v. United States*,
35 F.3d 388 (9th Cir. 1994) ................................................................. 20, 22

*Pac. Coast Fed. Of Fishermen's Ass'ns v. Gutierrez*,
606 F.Supp.2d 1195 (E.D. Cal. 2008)......................................................... 19

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) .................................................................... 23

*United States v. Alaska*,
608 F.Supp.3d 802 (D. Alaska 2022) .................................................. 15, 22

*Winter v. NRDC*,
555 U.S. 7 (2008) ................................................................................ 5

## Statutes

42 U.S.C. § 6504(a) ............................................................... 2, 6, 7, 15

42 U.S.C. § 6506a(b) ............................................................. 2, 6, 7, 15

## Regulations

43 C.F.R. § 2361.20(a) ................................................................. 3, 7

43 C.F.R. § 2361.20(d) ................................................................. 3, 7

## Federal Register Notices

42 Fed. Reg. 28721 (June 3, 1977) .................................................... 2

## Legislative History

H.R. 49, Rep. No. 94-942 (March 23, 1976) ........................................ 7

# INTRODUCTION

Plaintiffs move to enjoin implementation of the Bureau of Land Management's ("BLM") approval of ConocoPhillips Alaska Incorporated's ("ConocoPhillips") 2025-26 seismic and drilling exploration program ("exploration program") in the National Petroleum Reserve-Alaska ("Reserve"), pending adjudication of the merits of plaintiffs' challenge to that approval.

In its hurried approval of the exploration program, BLM ignored expert analysis showing that its primary measure for avoiding effects to tundra is ineffective. The agency failed to evaluate with the long-term impacts that are likely to be caused by its approval of the exploration program and the measures available to avoid these impacts. BLM's conclusion that it has met the protective standards of the Naval Petroleum Reserves Production Act ("Reserves Act") violates the Administrative Procedure Act ("APA") and the Reserves Act, because it fails to provide a rational connection between the facts found and the choice made. The exploration program is likely to cause population-level impacts to the Teshekpuk Caribou Herd, and irreparable harm to families and individuals who subsist on caribou and to others who use and enjoy the Reserve and its remarkable resources and values.

# BACKGROUND

The Reserve is an extraordinary and ecologically important landscape of lakes, rivers, wetlands, and sensitive coastal habitats. It is home to numerous species, including polar bears, caribou, moose, and millions of migratory birds. This landscape and its

wildlife are central to the traditional practices of local Alaska Native people. Ex. 2 at 2-55 ;[1] Ex. 18, ¶¶3-4, 7-10; Ex. 19 ¶¶ 4, 8, 12-13; Ex. 9 at 4-5.

Because of the Reserve's unique wildlife and subsistence values, the Reserves Act requires the Secretary of the Interior ("Secretary") to protect its surface resources any time he authorizes oil and gas activity there. 42 U.S.C. §§ 6504(a), 6506a(b). Specifically, it requires the Secretary to impose "conditions, restrictions, and prohibitions" on such activities that "the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects" to those resources. *Id.* § 6506a(b). Congress also designated certain areas, and authorized the Secretary to designate others, for "maximum protection" of "subsistence, recreational, fish and wildlife, or historical or scenic value[s]." *Id.* § 6504(a). Under this authority, the Secretary has designated areas around Teshekpuk Lake and the Colville River, among others, as Special Areas meriting such protection. 42 Fed. Reg. 28721, 28723 (June 3, 1977).

On July 14, 2025, the media reported that ConocoPhillips had submitted applications to BLM to seek authorization for its largest exploration program in the Reserve since 2020. Ex. 13 at 2-3. Concerned groups promptly requested that BLM make ConocoPhillips' applications and related materials available to the public. Ex. 14 at 6-9. Throughout the summer and early fall, groups continued to press BLM and

---

[1] Exhibits plaintiffs cite in support of likelihood of success on the merits are documents that should appear in the administrative record. *See* Declaration of Dooley.

ConocoPhillips to disclose additional information about the exploration program.  Doc. 1 at 13-15; Ex. 1 at 2-4; Ex. 14 at 2-3.  Neither BLM nor ConocoPhillips provided the requested documents.

Then, on November 10, 2025, while the federal government was shut down and just before a federal holiday, BLM published its draft environmental assessment ("EA"), providing just one week to comment on a massive, proposed exploration program.  Ex. 2 at 7, 106; Ex. 1 at 2-4; Ex. 14 at 1-3.

The draft EA detailed an exploration program that included a 192,000-acre seismic survey area that would occur in substantial part within the Colville River Special Area, Ex. 2 at 22, fig. 2, an area specially designated for, among other significant resource values, its importance for subsistence and recreational activities, and for providing important bird habitat, 43 C.F.R. § 2361.20(a).  The draft EA also described an extensive drilling and plugging and abandonment program that would include constructing 81 miles of ice roads and 15 ice pads, ranging in size from 40,000 to 1,000,000 square feet in size. Ex. 2 at 28-29, tbl. 2.4; *id.* at 30, tbls. 2.5, 2.6.  Three of the proposed drill sites and related ice roads and infrastructure would occur within the Teshekpuk Lake Special Area, *id*. at 24, fig. 4, an area specially designated because of its importance as habitat for the Teshekpuk Caribou Herd, for subsistence activities, and for migratory and other bird species, 43 C.F.R. § 2361.20(d).

During the brief comment period, scientific and subject matter experts submitted detailed analyses showing BLM's primary measure for avoiding harm to the Reserve's

sensitive vegetation and soils, required operating procedure ("ROP") C-2, is ineffective and inadequate to protect the surface resources of the Reserve, as required by the Reserves Act. Ex. 1 at 4-13, 73-121, 128-37; Ex. 15; Ex. 16 at 5-139.[2] ROP C-2 states tundra travel activities would not be permitted until soil is sufficiently frozen and "vegetation is covered with adequate snow," which BLM "define[s] as 6 inches average depth." Ex. 3 at 69. ROP C-2 applies to tundra travel activities that include seismic survey activities, and prepacking that is completed before ice and snow roads and ice pads are constructed. Ex. 3 at 24 (describing prepacking); *id.* at 26-28 (describing access); *id.* at 64-65 (describing prepacking requirements); *id.* at 69 (describing reliance on ROP C-2); *id.* at 81-82 (ROP C-2). This means that ROP C-2's effectiveness, or lack thereof, is relevant to the infrastructure and activities that would support each component of the exploration program. *Id.* at 22-24.

Additional analyses submitted to BLM show that the exploration program is likely to cause population-level impacts to the Teshekpuk Caribou Herd, and in turn cause long-term harm to subsistence hunters and the communities for whom caribou provide food security and health and wellbeing. Ex. 1 at 21-32, 122-26; Ex. 18, ¶¶4-6, 8, 10-12; Ex. 19, ¶¶8-9, 12-13. The record also shows the exploration program is likely to cause long-term harm to vegetation and soils that provide crucial habitat to caribou, birds, and a host of other wildlife in the Reserve, including those within the Teshekpuk Lake and Colville

---

[2] For the reasons described in the cover letter for Exhibit 16, plaintiffs respectfully submit these reports should be part of the administrative record. Ex. 16 at 1-3.

River Special Areas.  Ex 1 at 5-13, 100-09; Ex. 15 at 1-4, 51-84, 91-99 (describing and illustrating seismic impacts in the Reserve); Ex. 16 at 80-139.

On November 26, on the eve of another federal holiday, and just nine days after the close of the comment period, BLM issued its final EA, a finding of no new significant impacts ("FONNSI"), and a decision record approving ConocoPhillips' exploration program.  Ex. 3; Ex. 5; Ex. 4.

## ARGUMENT

Plaintiffs request that this Court enjoin defendants' authorization of the exploration program, pending adjudication of the merits.  Plaintiffs meet all four factors for obtaining such relief: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## I.    Plaintiffs are likely to succeed on the merits.

### A.    Plaintiffs have standing.

Protecting the Reserve is central to plaintiffs' missions.  Ex. 17, ¶¶ 4-6; Ex. 20 ¶¶10-11, 17; Ex. 21, ¶¶4, 6-8.  Plaintiffs have members who live in or who visit the Reserve for subsistence and traditional cultural practices, wildlife viewing, photography, for economic livelihood, and/or aesthetic and spiritual enjoyment, and whose interests will be harmed by the exploration program.  Ex. 19, ¶¶4-5, 8-13; Ex. 18, ¶¶4-7, 10-12; Ex. 22, ¶¶5-9, 11-17; Ex. 23, ¶¶5-6, 9-10, 17-23, 25-26; Ex. 17, ¶¶3, 5, 8-10; Ex. 20, ¶¶2,

10-12, 17-18; Ex. 21, ¶¶3, 11, 13-14.  An order setting aside the decision record, thereby

halting implementation of the program until defendants comply with the law, would

redress those harms.  Plaintiffs thus have associational standing.  *See Ecological Rights

Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

    **B.**    **BLM's reliance on ROP C-2 is arbitrary.**

    The Reserves Act requires BLM to "provide…restrictions" sufficient to mitigate

reasonably foreseeable and significantly adverse effects on surface resources across the

Reserve, 42 U.S.C. § 6506a(b), and to assure "maximum protection" for significant

resource values within Special Areas, *id.* § 6504(a).  These requirements are substantive

and must be satisfied through a reasoned decision: under the APA, an agency must

"examine the relevant data and articulate a satisfactory explanation for its action

including a 'rational connection between the facts found and the choice made.'" *Motor

Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (citation omitted).

    BLM failed to meet this standard:  it approved the winter exploration program

because it concluded that the program would cause only "minor" and "temporary" effects

to tundra, and that impacts to tundra would be "further minimized" by application of its

mitigation measures.  Ex. 3 at 64-66, 69-70; Ex. 5 at 1-3.  However, the record shows that

ROP C-2 is ineffective and, as BLM acknowledges, tundra travel activities governed by

ROP C-2 are likely to result in long-term, not temporary or minor, impacts to vegetation

and soils in the Reserve.  BLM failed to examine this evidence and connect it to its

decision.  The record also shows that BLM failed to evaluate numerous feasible

mitigation measures proposed by experts and commenters that would better protect the tundra, and thus further avoid or minimize impacts from these activities. Given this record, BLM's conclusion that it has met the protective standards of the Reserves Act by imposing ROP C-2 violates the APA and Reserves Act because it fails to provide a rational connection between the facts found and the choice made. *State Farm*, 463 U.S. at 43.

### 1. BLM must mitigate impacts to tundra and assure maximum protection.

BLM is required to mitigate significantly adverse effects to tundra, because tundra is an integral surface resource of the Reserve. 42 U.S.C. § 6506a(b). BLM is also required to assure "maximum protection" of tundra as a surface value of, and important habitat in, the Colville River and Teshekpuk Lake Special Areas. *Id.* § 6504(a); *id.* § 6504(a); 43 C.F.R. § 2361.20(a), (d) (requiring maximum protection of important habitat for birds, caribou, fish, and other wildlife in these special areas); H.R. 49, Rep. No. 94-942, at 21 (March 23, 1976) ("The legislation makes it clear that the Secretary may designate certain areas…where special precautions may be necessary to control activities which could disrupt the surface values or disturb the associated fish and wildlife habitat values and related subsistence requirements of the Alaska Natives."); Ex. 1 at 16-17; *e.g.*, Ex. 24 at 4 (expanding the purpose of Teshekpuk Lake Special Area to protect caribou and bird habitat). Tundra provides important habitat for caribou, birds, and fish in the Colville River and Teshekpuk Lake Special Areas. *E.g.*, Ex. 25 at 79-81, 82-84, 107-117; Ex. 26 at 25-27, 29-30; Ex. 3 at 90 (advising against tundra travel before August to

protect nesting birds); Ex. 7 at 13a-k; Ex. 6 at 1b; *id.* at 56a.  BLM is thus required to

mitigate impacts to tundra and assure it maximum protection in these Special Areas.

> **2.    BLM does not explain how ROP C-2 protects tundra under actual snow conditions, and thus BLM's determination that impacts would be minor and temporary is arbitrary.**

Under ROP C-2, BLM states that tundra travel activities—such as prepacking for

snow and ice roads and driving seismic and camp equipment onto the tundra—would not

be permitted until soil is sufficiently frozen and "vegetation is covered with adequate

snow," which BLM "define[s] as 6 inches average depth."  Ex. 3 at 69.  However, the

six-inch snow depth standard cannot be reliably met, because snow depths in the

exploration program area are consistently below six inches where tundra travel would

occur—due to heterogeneous snow coverage caused by wind, topography, climate, and

other factors.  Ex. 1 at 78-79 (describing snow depth spatiotemporal heterogeneity); Ex. 3

at 66 (BLM acknowledging impacts could "vary greatly" depending on variable snow,

topography, and other factors).  Shallow, wind-scoured snowpacks dominate the

exploration area all winter, leaving only scattered pockets of deeper, protective snow, and

making it improbable if not impossible to assure snow depths of six inches across tundra

travel areas.  Ex 1 at 75-88; Ex. 16 at 68, fig. 17 (showing study area is adjacent to and

overlaps proposed seismic operational area); *id.* at 74-75, fig. 24 (showing 70 percent of

study area had snow depths less than six inches near the height of winter (March)); Ex.

15 at 43-44, 86.

High resolution modeling shows that even in April (at or near peak snow season),

snow depth is consistently below six inches:



Ex. 1 at 81, fig. 9 (modeling snow cover across exploration program area on April 1, 2025, with red indicating snow depths <6 inches and blue indicating snow depths ≥6 inches).  For the seismic survey area, vehicles traveling across the tundra "repeatedly would cross in and out of areas with snow depths <6 inches," Ex. 1 at 81:



*Id.* at 82, fig. 10 (showing snow depths for January 1, 2025 (green line) and April 1, 2025 (blue line) along a transect within the seismic survey area). The same is true for the "exploration west" drilling area. Ex. 1 at 85-86, figs. 14-15. In some years, substantial portions of these areas would never reach six-inch snow depths, Ex. 1 at 83, figs. 11, 12; *id.* at 87, figs. 16, 17, and over the past three years, no more than 55 percent of the broader area had snow depths greater than six inches, *id.* at 88.

Consistent with modeling, BLM-funded photogrammetry showed that in 2021, more than 70 percent of tundra within a 3,000-kilometer subset of the Reserve—an area similar to, adjacent to, and partly overlapping the seismic survey area—had snow depths in March below the six-inch minimum. Ex. 15 at 43-44, 86; Ex. 16 at 68, fig. 17; *id.* at 74-75, fig. 24. Because large portions of the seismic survey area will be covered by less than six inches of snow during operations, as BLM itself acknowledges, seismic impacts on soils and vegetation "would likely [] be distributed throughout the project area," *i.e.*,

would be widespread.  Ex. 5 at 3.

In the final EA and decision documents, BLM does not examine this evidence or connect it to its finding that vegetation and soil impacts will be "minor," "temporary," and "minimized" through application of ROP C-2.  Ex. 3 at 64-66, 69-70; Ex. 5 at 1-3. Rather, the decision record adds a "Monitoring" provision, stating BLM will "ensure compliance" with mitigation measures.  Ex. 4 at 2.  However, as discussed in this section, complying with ROP C-2's snow depth requirement is not reasonably achievable given BLM's current plan.  BLM does not address the evidence of highly variable topographic and other conditions that show it is likely that much, if not most, of the program area will not meet ROP C-2's six-inch snow standard during winter operations.  BLM's failure to examine this evidence and connect it to its conclusion about the impacts of its decision, renders its decision arbitrary and in violation of the Reserves Act.

### 3. The record shows ROP C-2's six-inch snow depth standard fails to prevent impacts from tundra travel.

Historical and recent seismic operations have caused multi-year and multi-decade tundra damage despite minimum snow and freeze depth requirements.  Ex. 1 at 10-11, 101-02; Ex. 8 at 2; *e.g.*, Ex. 15 at 1.  Evidence provided to BLM before its decision documents long-term impacts to vegetation and soils following similar winter road, ice-pad, and seismic programs—even when snow depth standards applied.  Ex. 1 at 101-02; Ex. 15 at 1, 51-84, 91-99.  In addition, the evidence shows that despite snow depth requirements, seismic exploration in the Reserve is having a cascading effect: cumulative impacts from successive seismic programs are "outpacing recovery" from

previously permitted seismic programs. Ex. 1 at 101. This is resulting in areas with "moderate to severe impacts and altered vegetation increas[ing] every year." *Id.* at 100.

Finally, BLM acknowledges that impacts from tundra travel will likely result in long-term impacts, including potentially "an irreversible eroding thermal process (e.g., thermokarst), ground subsidence, and changes in species composition." Ex. 3 at 66. BLM admits scars from these activities could "persist," and that "[t]he timeframe for full vegetation recovery could be highly variable," including, potentially, some impacts lingering even 25 years. *Id.* This directly contradicts BLM's conclusion that impacts from the exploration program will be only "temporary." Ex. 5 at 1.

BLM does not address this contradiction. Instead, the decision record states, "inspections will be used to document and monitor potential disturbance." Ex. 4 at 2. But documenting damage after it occurs does not prevent impacts. BLM's previous reliance on the unrealistic six-inch snow depth standard has resulted in long-term, cascading harms to the Reserve. Because the factual premise underlying BLM's mitigation—that six-inch snow depths prevent significant surface disturbance—is contradicted by the record before the agency at the time of its decision, BLM's determination that ROP C-2 mitigates significantly adverse effects and assures maximum protection under the Reserves Act is arbitrary.

### 4. ROP C-2 fails to include specific measures to avoid impacts from seismic camp moves.

The record shows that seismic camp-move operations cause the greatest tundra damage. Ex. 1 at 54-55, 101; Ex. 11 at 4; Ex 8 at 11. Heavy camp-move vehicles,

including bulldozers, drag massive amounts of equipment across the tundra, producing deeper ruts, greater vegetation crushing, and longer-lasting surface disturbance than seismic and other tundra travel activities. Ex. 1 at 54-55, 100-01, 106-07; Ex. 16 at 34-35, 38, 40. ROP C-2 omits any mention of the use of this equipment and contains no camp-move specific requirements to avoid impacts from this activity. Ex. 3 at 81; Ex. 1 at 105; *see also* Ex. 15 at 9; Ex. 16 at 40. BLM's decision documents do not account for this omission. Thus, BLM's conclusion that it has met the protective Reserves Act standards by imposing ROP C-2 is arbitrary, because BLM failed to address this evidence and to provide a rational connection between the facts found and the choice made.

**C.    BLM failed to evaluate or apply measures that would have avoided impacts from tundra travel activities.**

BLM failed to evaluate several more protective measures that, if applied, would have avoided additional impacts from tundra travel activities and filled some of the protectionary gaps left by ROP C-2. BLM states that "[t]here were no additional mitigation measures evaluated that were not carried forward." Ex. 3 at 107. This shows BLM did not even evaluate the specific, feasible measures discussed below, which were raised by experts and commenters on the draft EA, and which would substantially reduce tundra damage.

For example, experts proposed that BLM use available aerial snow depth and vegetation mapping, coupled with basic planning, to route prepacking, seismic, and camp-move activities away from areas of shallow snow, sensitive vegetation, and particularly challenging terrain. Ex. 1 at 104-05, 107-08, 128-29; Ex. 15 at 13-19; Ex. 16

at 43-45. Commenters and experts also recommended improving ROP C-2 by requiring a showing of three inches of snow-water equivalent measurement above vegetation tops before permitting tundra travel, which would better protect vegetation. Ex. 1 at 8, 15, 56, 104, 107.

Commenters also urged BLM to consider requiring increased use of low-ground pressure vibroseis vehicles already planned to be deployed for some seismic activities, Ex. 3 at 112, and which are designed to navigate "environmentally sensitive areas with minimal impact." Ex. 1 at 55-56 (quoting manufacturer's press release). BLM also failed to evaluate using a snow road to support camp move activity. *See* Ex. 1 at 54-56; *supra* pp. 12-13 (describing outsized impacts from camp-moves); Ex. 7 at 23 ("Modern seismic surveying uses fewer vibroseis vehicles and smaller and lighter seismic equipment. *It is done only on snow roads*, using low ground pressure vehicles, all of which may reduce impacts on underlying vegetation") (emphasis added).

BLM neither incorporated these measures nor explained why it disregarded them. BLM's conclusion that impacts to vegetation and soils would be "minimized" through application of ROP C-2, Ex. 3 at 64-66, 69-70, is arbitrary under *State Farm* because the agency failed to evaluate, let alone apply, readily available measures. 463 U.S. at 43. BLM's measures simply "do not minimize…impacts to tundra vegetation." Ex. 1 at 107. Its unexplained decision to forgo more protective, readily available restrictions further undermines its conclusion that relying on ROP C-2 satisfies the Reserve's Act mitigation and protective mandates, and further demonstrates BLM's failure to provide a rational

connection between the facts found and decision made.

## II. Plaintiffs will suffer irreparable harm without an injunction.

The exploration program will irreparably harm plaintiffs' use of the Teshekpuk Caribou Herd for subsistence, and ability to photograph caribou and unblemished landscapes in the Reserve.

"Irreparable harm should be determined by reference to the purposes of the statute being enforced." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018). Plaintiffs' injuries are irreparable in light of the Reserves Act's purposes, which include "maximum protection" of the significant subsistence, recreational, wildlife, and scenic values of special areas when exploration occurs in those areas, 42 U.S.C. § 6504(a), and the duty to mitigate significant effects on surface resources, *id.* § 6506a(b). Plaintiffs' members' injuries flow from damage to those values and resources, including in the Teshekpuk Lake and Colville River Special Areas: harm to caribou, deflection of caribou, damage to the tundra, and visual and auditory disturbances.

In addition to implicating the Reserves Act's purposes, plaintiffs' injuries are irreparable by nature. Environmental injury "can seldom be adequately remedied by money damages and is often permanent or at least of long duration." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Injuries to food security and cultural identity are also difficult if not impossible to remedy. *See, e.g.*, *United States v. Alaska*, 608 F.Supp.3d 802, 810–11 (D. Alaska 2022) (preventing a subsistence fisherman from

fishing "and thus working toward harvesting subsistence goals" constitutes irreparable harm because "neither the Court nor the parties can go back in time to remedy the harm financially"); *District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp.3d 1, 43 (D.D.C. 2020) ( "Going without food is an irreparable harm.").

> A.   **The exploration program will likely cause population-level harm to the Teshekpuk Caribou herd.**

Caribou scientists Dr. Gunn, Dr. Kofinas, and Mr. Russell ("Gunn *et al.*") concluded that, against the backdrop of ongoing Willow construction activities, the exploration program will reduce pregnancy and calf survival rates for the Teshekpuk Caribou Herd and "population-level impacts are likely to occur."  Ex. 1 at 124.

> 1.   **Displaced caribou eat less, give birth less, and survive less, leading to population-level harm.**

Caribou are sensitive to noise and movement.  Ex. 3 at 53.   They can be deflected from their course even when one to four miles from development—particularly parturient females, which are highly sensitive.  *Id.*  The exploration program will stress caribou and force avoidance behavior, both in winter and during the spring migration to calving grounds, which passes right through the exploration program area.  *Id.*; *id.* at 48, fig. 5.

While periods of stress and forced movement are temporary, their costs to caribou are not.  Even "[b]rief durations of interrupted foraging time, if frequent enough, will accumulate and affect caribou reproduction and survival."  Ex. 10 at 9.  Winter, in particular, "is an energetically stressful season for caribou and reduced energy intake results in smaller calf birth weights, higher early calf mortality, and cows in poorer

condition entering the summer." *Id.* at 7. Cows will also sacrifice access to high quality forage to avoid calving near development, compromising their nutrition and leading potentially to "adverse effects on calf survival." *Id.* at 9. Consistent with these observations, "experience elsewhere has shown how caribou behavioral responses to development activities can accumulate to impact herd-level vital rates such as pregnancy and calf survival." *Id.* at 6.

### 2. The Teshekpuk Caribou Herd is increasingly vulnerable in winter.

Wintering on the coastal plain exposes the Teshekpuk Caribou Herd to extreme winter conditions that other herds do not experience. *Id.* at 6. BLM emphasizes the herd's winter range "is large" and "widespread," and argues "caribou would be unlikely to be displaced from preferred winter forage." Ex. 3 at 53. However, as Gunn *et al.* explained, BLM's reasoning "does not take into account why the winter range has to be large which is to accommodate caribou habitat selection relative to annual variability in snow conditions." Ex. 1 at 125. "In other words, in any one year, snow conditions constrain habitat selection." *Id.*; *see also* Ex. 22, ¶10 ("Their winter habitat use is constrained by weather, icing events, forage conditions, and disturbance."). Furthermore, climate change is projected to increase the frequency of icing events, which reduces cow survival. Ex. 10 at 11. "[H]ydrocarbon development within the key ranges of the herd[,]" such as the exploration program "will only exacerbate those trends." *Id.*

### 3. The Willow development is likely causing population-level harm, and the exploration program will expand that harm.

Gunn *et al.* concluded in 2023 that construction activities associated with the Willow development were "more likely than not to affect distribution and movements of [the Teshekpuk Caribou Herd] and result in population-level impacts." Ex. 10 at 6. For the first time, the Willow development extended "oilfield activity west into the more highly used annual [Teshekpuk Caribou Herd] ranges." *Id.* This is affecting caribou movements and distribution. Ex. 10 at 6 (predicting this effect); Ex. 1 at 125 & n.10 (citing monitoring report and explaining "[c]aribou responses to the previous year's Willow construction were measurable as changes in local distribution"); Ex. 18, ¶8 ("Hunters now have to go much farther to find caribou."). BLM's final EA does not evaluate whether those changes have harmed the herd's vital rates. Ex. 3 at 47-54; Ex. 1 at 123. This winter, the Willow development will require 190,286 vehicle trips. Ex. 10 at 5. That is more than double last year's trips, which was nearly triple the first year's. *Id.*

The intensifying Willow activities will overlap with exploration program activities. Ex. 1 at 124. The exploration program would extend the network of industrial disturbance even further west and south, into the Teshekpuk Lake and Colville River Special Areas. Ex. 3 at 5, fig. 1. Pushing into these high use areas for the herd will increase its cumulative exposure and reduce the availability of clear migration routes. Ex. 3 at 48-49, figs. 5 & 6. The majority of the herd is likely to be exposed to Willow and exploration program activities. Ex. 10 at 6. Their combined effects on the herd are

likely to cause irreparable harm. *Pac. Coast Fed. Of Fishermen's Ass'ns v. Gutierrez*, 606 F.Supp.2d 1195, 1213 (E.D. Cal. 2008) ("Irreparable harm to justify injunctive relief is shown when the agency action causes appreciable (i.e., considerable or substantial) harm to the species or its critical habitat, as measured by the combined effects of the action and underlying baseline conditions."); Ex. 1 at 18-20.

### 4. Population-level harm to the Teshekpuk Caribou Herd will irreparably harm plaintiffs' ability to obtain subsistence food.

Any decline in the Teshekpuk Caribou Herd irreparably harms plaintiffs' members who hunt for caribou near Nuiqsut, Ex. 22, ¶8, as well as those who receive caribou from other hunters. *Id.*; Ex. 19, ¶8; Ex. 18, ¶6.

Colleen Lea Sovalik has lived in Nuiqsut for 22 of the last 37 years beginning in 1988. Ex. 19, ¶1. "Caribou is very important for us," she explains. *Id.*, ¶8 *see also* Ex. 18, ¶5 ("Traditional foods, like caribou…are part of my culture and who I am."). "But with all of the building, our animals aren't there…. We are lucky to see 20 and there is often not enough to share. Our elders are suffering from it." Ex. 19, ¶9.

Geoff Carroll of Utqiaġvik is a hunter and retired Alaska Department of Fish and Game wildlife biologist of 27 years, Ex. 22, ¶3, who "was responsible for monitoring the health, productivity, and survival of [the Teshekpuk Caribou] herd, understanding its ecology, and helping ensure its long-term sustainability." *Id.*, ¶5. "If this winter's seismic and exploration work displaces caribou or reduces forage availability," he writes, "hunters, including myself, will have greater difficulty harvesting caribou next year and in the future. This will directly affect my ability to obtain food for my household [and]

more importantly, it will affect the community's ability to feed itself." *Id.*, ¶15.

"[A] shocking portion of the North Slope households report food insecurity." Ex. 10 at 17. In 2019, more than 20 percent of Nuiqsut and Utqiaġvik households experienced difficulty getting food for healthy meals; more than 50 percent of those could not get enough subsistence foods. Ex. 27 at 4, 7. Harm to subsistence sharing is likely to negatively affect human health because sharing "commonly delivers wild food to the neediest members of the community." Ex. 10 at 17.

Population-level harm to caribou would irreparably harm plaintiffs' members because the "deprivation of nutrition, and the psychological and physical distress attending that deprivation, are 'quite likely to impose lingering, if not irreversible' effects on the individual plaintiffs." *District of Columbia*, 444 F.Supp.3d at 43 (quoting *Haskins v. Stanton*, 794 F.2d 1273, 1276 (7th Cir. 1986)). Loss of caribou as a traditional subsistence food, specifically, adds another dimension of irreparable harm that is cultural. *See Native Vill. of Quinhagak v. United States,* 35 F.3d 388, 394 (9th Cir. 1994) (reversing the district court's denial of a preliminary injunction that would prevent interference with plaintiffs' subsistence "way of life and cultural identity").

### B. The exploration program will irreparably harm the Teshekpuk Lake and Colville River Special Areas.

Plaintiffs' members also use and enjoy the Teshekpuk Lake and Colville River Special Areas for their relative isolation from development and opportunities for encountering caribou, raptors, and other wildlife and ecological values.

Gerrit Vyn is a wildlife photographer, cinematographer, and conservation-media

producer.  Ex. 23, ¶1.  He intends to take commercial photographs and film within the Judy Creek drainage in the Teshekpuk Lake Special Area and in the Colville River Special Area, including in areas where seismic surveying and drilling will occur, as part of a multi-year project to build a long-term visual archive of the Reserve.  *Id.*, ¶¶12-14.  The 300-square-mile seismic grid and drilling-related program will leave scars that persist for years—including directly adjacent to the Colville River, and in the Kikiarorak and Kogosukruk river watersheds.  *See supra* pp. 11-12; Ex. 1 at 130, fig. 1; Ex. 3 at 5, fig. 1; *e.g.*, Ex. 16 at 96-97, 81-82 (showing long-lasting damage from ice roads).  Vyn is nearly certain to encounter this damage, irreparably harming his ability to observe wildlife and ecological processes in an intact landscape.  Industrial scars "permanently alter the scenes" he is trying to document, Ex. 23, ¶20 and "reduce the quality and uniqueness of the imagery" he can produce.  *Id.*, ¶23.  Once the exploration program's impacts occur, the places Vyn planned to visit in 2026 can no longer be experienced in the unblemished state that motivated his travel and professional commitments.  This harm is irreparable.

## III.    The balance of harms tips sharply in plaintiffs' favor.

When environmental injury is "sufficiently likely," the balance of harms "will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545.  Plaintiffs' members are likely to experience environmental harm and harm to their food security, cultural identity, and livelihoods.  *See supra* pp. 18-21.  Harm to a traditional food source like caribou, especially population-level harm, *see supra* pp.

19-20, weighs heavily in favor of an injunction. *See Native Vill. of Quinhagak*, 35 F.3d at 393-94 (balance of harms tipped sharply in favor of subsistence fishers even without a finding of harm to fish populations); *United States v. Alaska*, 608 F.Supp.3d at 812 (consistent with the Alaska National Interest Lands Conservation Act's purpose of protecting subsistence, the balance of equities favored subsistence user plaintiffs regardless of whether salmon populations would be irreparably harmed).

Any claims of economic loss by defendants and ConocoPhillips do not outweigh these harms. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) ("[L]oss of anticipated revenues … does not outweigh the potential irreparable damage to the environment."), *abrogated on other grounds by Monsanto v. Geertson Seed Farms*, 561 U.S. 139 (2010). Especially when any economic harm would temporary. *See League of Wilderness Defs./Blue Mountain Biodiversity Project v. Connaughton*, 752 F.3d 755, 765-66 (9th Cir. 2014); *Indigenous Env't Network v. United States Dep't of State*, 369 F.Supp.3d 1045, 1051-52 (D. Mont. 2018) (environmental harms to plaintiffs outweighed economic harms to developer from loss of construction season).

## IV. A preliminary injunction advances the public interest.

Ensuring faithful compliance with federal laws "comports with the public interest." *All. for the Wild Rockies*, 632 F.3d at 1138; *League of Women Voters v. Newby,* 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Plaintiffs have demonstrated a likelihood of success on the

merits of their claims that BLM violated the Reserves Act and APA when it approved the exploration program. Given the agency's unlawful action, and the irreparable harm the exploration program poses to plaintiffs' members, enjoining exploration program activities advances the public interest. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

## CONCLUSION

Plaintiffs request that this Court enter a preliminary injunction effective until this Court issues a final decision on plaintiffs' claims.

Respectfully submitted this 11th day of December, 2025.

*s/ Ian S. Dooley*

Ian S. Dooley (Alaska Bar No. 2006059)
Erin Colón (Alaska Bar No. 1508067)
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE

*Attorneys for Plaintiffs Sovereign Iñupiat for a Living Arctic, Center for Biological Diversity, and The Wilderness Society*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 5,588 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(2).

Dated: December 11, 2025, 2025.

*s/ Ian S. Dooley*
_____
Ian S. Dooley
EARTHJUSTICE

# CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, a copy of the foregoing

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, with attachments, will

be served first class mail on the following:

Doug Burgum, Secretary
United States Department of the Interior
1849 C Street NW
Washington, DC 20240

United States Department of the Interior
1849 C Street NW
Washington, DC 20240

Bill Groffy, Principal Deputy Director and
Acting Director
Bureau of Land Management
1849 C Street NW
Washington, DC 20240

Bureau of Land Management
1849 C Street NW
Washington, DC 20240

Kevin Pendergast, Alaska State Director
Bureau of Land Management
222 W 7th Avenue #13
Anchorage, AK 99513

Pamela Bondi, Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Stephanie Kuhns, District Manager
Bureau of Land Management
Arctic District Office
222 University Avenue
Fairbanks, AK 99709

Civil Process Clerk
U.S. Attorney, District of Alaska
United States Department of Justice
222 West 7th Avenue, Room 253, #9
Anchorage, AK 99513

Wayne Svejnoha, Branch Chief, Energy
and Minerals
Bureau of Land Management
Arctic District Office
222 University Avenue
Fairbanks, AK 99709

I further certify that on December 11, 2025, a courtesy copy of the foregoing

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION was

served on the following by electronic mail:

Paul Turcke                                   Jason Morgan
U.S. Department of Justice                    Ryan Steen
E: Paul.Turcke@usdoj.gov                      Stoel Rives LLP
                                              E: jason.morgan@stoel.com
                                              E: ryan.steen@stoel.com

                      *s/ Ian S. Dooley*
                      Ian S. Dooley
                      EARTHJUSTICE

# TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Alaska Wilderness League *et al.*, Comments on ConocoPhillips Alaska Inc.'s 2025-2026 Winter Exploration Project in the National Petroleum Reserve – Alaska (Nov. 17, 2025) |
| 2 | Bureau of Land Management (BLM), Draft Environmental Assessment, ConocoPhillips Seismic Exploration, Exploration Drilling, and Existing Well Plugging (Nov. 2025) |
| 3 | BLM, Environmental Assessment, ConocoPhillips Seismic Exploration, Exploration Drilling, and Existing Well Plugging (Nov. 2025) |
| 4 | BLM, Decision Record for ConocoPhillips Seismic Exploration, Exploration Drilling, and Existing Well Plugging (Nov. 26, 2025) |
| 5 | BLM, Finding of No New Significant Impact for ConocoPhillips Seismic Exploration, Exploration Drilling, and Existing Well Plugging (Nov. 26, 2025) |
| 6 | BLM, National Petroleum Reserve-Alaska, Final Integrated Activity Plan/ Environmental Impact Statement, Vol. 1 (Nov. 2012) (excerpts) |
| 7 | BLM, National Petroleum Reserve-Alaska, Final Integrated Activity Plan/ Environmental Impact Statement, Vol. 1 (June 2020) (excerpts) |
| 8 | M.K. Raynolds *et al.*, *Landscape impacts of 3D-seismic surveys in the Arctic National Wildlife Refuge, Alaska*, ECOL. APPS. 00(00):e02143 (2020) |
| 9 | Alaska Soles, Great Old Broads for Wilderness *et al*., Comments on the Willow Master Development Plan Draft Supplemental Environmental Impact Statement (Aug. 29, 2022) (excerpts) |
| 10 | Declaration of Gary Kofinas, Anne Gunn, and Donald E Russell, *Center for Biological Diversity et al. v. Bureau of Land Management et al.*, Case No. 3:23-cv-00061-SLG, Doc. 209-1 (Dec. 3, 2023) |
| 11 | BLM, ConocoPhillips Ptarmigan Seismic Survey, Environmental Assessment (2024) (excerpts) |

| 12 | Exhibit omitted. |
|---|---|
| 13 | J.A. Dlouhy, *ConocoPhillips Seeks New Oil Drilling in Alaskan Arctic*, BLOOMBERG NEWS (July 14, 2025) |
| 14 | The Wilderness Society, Letter Re: Request for Extension of Public Comment Period for ConocoPhillips Seismic Exploration, Exploration Drilling, and Existing Well Plugging (DOI-BLMAK-R000-2026-0002-EA) (Nov. 12, 2025) |
| 15 | Dr. M. Nolan, Comments submitted to the BLM in response to the draft EA for ConocoPhillips' Seismic Exploration (Nov. 17, 2025) |
| 16 | Earthjustice *et al.*, Letter Re: ConocoPhillips Seismic Exploration, Exploration Drilling, and Existing Well Plugging, Environmental Assessment, DOI-BLM-AK-R000-2026-0002-EA (Nov. 2025) (Nov. 28, 2025) |
| 17 | Declaration of Nauriaq Simmonds |
| 18 | Declaration of Ronald Simmons |
| 19 | Declaration of Colleen Lea Sovalik |
| 20 | Declaration of Cooper Freeman |
| 21 | Declaration of Peter Aengst |
| 22 | Declaration of Geoff Carroll |
| 23 | Declaration of Gerrit Vyn |
| 24 | BLM, National Petroleum Reserve-Alaska, Integrated Activity Plan, Record of Decision (Feb. 21, 2013) (excerpts) |
| 25 | The Wilderness Society, Assessment of Ecological and Cultural Values Within the National Petroleum Reserve – Alaska (Aug. 2024) |
| 26 | National Academies, Cumulative Environmental Effects of Oil and Gas Activities on Alaska's North Slope (2003) (excerpts) |

| 27 | North Slope Borough, 2019 Economic Profile & Census Report (2019) (excerpts) |