Ian S. Dooley
Erin Colón
Erik Grafe
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: idooley@earthjustice.org
E: ecolon@earthjustice.org
E: egrafe@earthjustce.org

*Attorneys for Plaintiffs Sovereign Iñupiat for a Living Arctic et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, CENTER FOR BIOLOGICAL DIVERSITY, and THE WILDERNESS SOCIETY, <br><br> *Plaintiffs*, <br><br> v. <br><br> DOUG BURGUM, in his official capacity as Secretary of the Interior; BILL GROFFY, in his official capacity as Principal Deputy Director, exercising the authority of the Acting Director of the Bureau of Land Management; KEVIN PENDERGAST, in his official capacity as Alaska State Director of the Bureau of Land Management; STEPHANIE KUHNS, in her official capacity as District Manager for the Bureau of Land Management; WAYNE SVEJNOHA, in his official capacity as Branch Chief, Energy and Minerals for the Bureau of Land Management; UNITED STATES DEPARTMENT OF THE INTERIOR; and BUREAU OF LAND MANAGEMENT, <br><br> *Defendants*, <br> and <br><br> CONOCOPHILLIPS ALASKA, INC. and STATE OF ALASKA, <br><br> *Intervenor-Defendants*. | Case No. 3:25-cv-00356-SLG |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (5 U.S.C. §§ 701-706; 42 U.S.C. §§ 6501-6508)

# INTRODUCTION

1.      This action arises from the Bureau of Land Management's ("BLM") approval of ConocoPhillips Alaska Incorporated's ("ConocoPhillips") seismic and exploration drilling program ("exploration program") in the National Petroleum Reserve-Alaska ("Reserve"). The record shows the exploration program is likely to cause long-term harm to vegetation and soils that provide crucial habitat to caribou, birds, and a host of other wildlife in the Reserve, including to those within the Teshekpuk Lake and Colville River Special Areas. The exploration program is also likely to cause population-level impacts to the Teshekpuk Caribou Herd, and long-term harm to subsistent hunters and the communities who use the herd for food security, and to ensure their health and wellbeing.

2.      BLM has pushed this project through without proper analysis or process and without considering the significant flaws in the measures it relies on to justify its approval of the exploration program. Most notably, BLM has failed to reckon with the inadequacies of required operating procedure ("ROP") C-2, which is the agency's primary measure for avoiding impacts to vegetation and soils from seismic and other tundra travel activities, like prepacking for snow and ice roads. Expert evidence shows ROP C-2 is unsupported, ineffective, and ultimately inadequate to protect the surface resources of the Reserve, as required by the Naval Petroleum Reserves Production Act ("Reserves Act"). The record also shows BLM had a number of other available measures that, if employed, would have avoided or lessened the impacts from the exploration program.

3.      BLM issued a first final environmental assessment ("EA"), finding of no new significant impact ("FONNSI"), and decision record approving the exploration program on November 26, 2025 ("November" documents). Plaintiffs filed their initial complaint

commencing this action and moved for a preliminary injunction on December 11, 2025. Then, on December 23, 2025, BLM issued a second final EA, FONNSI, and decision record again approving the exploration program ("December" documents). Pursuant to Federal Rule of Civil Procedure 15(a)(1)(A), plaintiffs submit this amended complaint to account for BLM's December documents and decision.

4.      BLM's decisions violate the Reserves Act because they fail to rationally explain how approving the exploration program, which the record shows will result in significant adverse impacts, is consistent with BLM's obligation to protect surface resources from such impacts.

5.      Defendants' approvals of the exploration program are unlawful. The Court should vacate BLM's decision records approving the exploration program and preclude any action under the decisions from moving forward.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201-02. Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

7.      Plaintiff Sovereign Iñupiat for a Living Arctic ("SILA") is an Alaska-based grassroots organization made up of Iñupiat Peoples and community members. SILA's mission is "to create space for healthy communities, spiritually, mentally, and physically; fostering the connection between people, culture and land. We are empowered as frontline communities and those who have inherent connection with the land and what it provides." SILA seeks to accomplish its mission through community and shareholder engagement, knowledge-sharing events, political advocacy, and revitalizing Iñupiaq intergenerational culture and language.

SILA's major focus is uplifting the voices of communities in Arctic Alaska, including a focus on the western Arctic and development near the community of Nuiqsut. SILA actively works to empower Arctic communities to protect their interests by engaging in administrative processes with the goal of ensuring meaningful involvement for these communities. This includes advocacy and outreach around ConocoPhillips' exploration program, including by submitting comments during the public comment period.

8.     Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit organization, with offices across the country, including in Alaska. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 93,000 active members. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened by oil and gas leasing, exploration, and development. As part of these efforts, the Center works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas leasing, exploration, and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the climate crisis. The Center believes that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked.

9.     Plaintiff The Wilderness Society is a national nonprofit organization whose mission is to unite people to protect the nation's wild places. Founded in 1935, The Wilderness Society is headquartered in Washington, D.C., with offices throughout the country, including in Alaska. The Wilderness Society has more than one million members and supporters, many of whom are in Alaska. Its Alaska program works to build relationship with communities, co-create resilient conservation models, and permanently protect special places in the Arctic and

sub-Arctic, including in the Reserve. The Wilderness Society has been engaged in Reserve conservation efforts for decades and has consistently participated in public processes associated with Reserve land use decisions. Staff have visited the Northeast region of the Reserve on numerous occasions to assess conservation values, conduct scientific research, and meet with community members. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape during their life cycles.

10. Members of plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve, including the areas affected by ConocoPhillips' winter drilling and seismic activities, for various purposes, including subsistence activities, wildlife viewing, as an economic livelihood, photography, and/or aesthetic and spiritual enjoyment. For example, group members include residents of Nuiqsut, the community most directly affected by oil and gas activities in the Reserve, and by the exploration program. These members live in and use the areas affected by the exploration program. Another group's member relies on the area affected by the exploration program to create commercial nature films and photography. Members of plaintiff groups also use or otherwise enjoy migratory wildlife that depend on the ecological region in which the exploration program activities will occur, and that are threatened by these activities. For example, one group's member hunts caribou from the Teshekpuk Caribou Herd, and he and many in his community rely on the herd for near daily sustenance. ConocoPhillips' exploration program, as described and approved in BLM's EAs and decision records, will directly and irreparably injure these interests.

11. Plaintiffs submitted comments to BLM at multiple points during the environmental review process, including on the November 10 draft EA. Each of the plaintiff

groups monitors the use of public lands in the Reserve and compliance with the laws respecting these lands; educates its members and the public concerning the management of these lands; and advocates for policies and practices that protect the natural and cultural values and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the plaintiffs are germane to the member injuries described in this complaint.

12. The relief plaintiffs seek in this lawsuit will redress their injuries by setting aside defendants' approvals, enjoining the activities, and requiring defendants to comply with the law by avoiding harm to the Reserve's resources. This relief will give plaintiffs, their members, other supporters, staff, and the general public more comprehensive and complete information regarding the exploration program's immediate and longer-term impacts, including those to the tundra and related systems, and to the Teshekpuk Caribou Herd. It will also give permitting authorities the chance to make better-informed decisions about whether and on what terms to approve the program.

## DEFENDANTS

13. Defendant Doug Burgum is the Secretary of the United States Department of the Interior. He is sued in his official capacity.

14. Defendant Bill Groffy is the official who is exercising the authority of the Director of BLM. He is sued in his official capacity. Mr. Groffy is responsible for the supervision and management of all decisions, operations, and activities of BLM.

15. Defendant Kevin Pendergast is the Alaska State Director of BLM. He is sued in his official capacity.

16. Defendant Stephanie L. Kuhns is the District Manager for BLM's Arctic District Office. She is sued in her official capacity.

17. Defendant Wayne Svejnoha is Branch Chief, Energy and Minerals, for BLM Alaska. He is sued in his official capacity.

18. Defendant United States Department of the Interior is an agency of the United States responsible for oversight of BLM.

19. Defendant BLM is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve.

## STATEMENT OF FACTS

### I. Management of the Reserve

20. Originally set aside in 1923, the 23-million-acre Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, other wetlands, upland areas, and sensitive coastal resources. It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, among many other species. This landscape and wildlife are central to the livelihoods and traditional practices of Iñupiat people living in the region.

21. In 1976, Congress passed, and subsequently amended in 1980, the Reserves Act, which transferred jurisdiction over the Reserve from the U.S. Navy to the Secretary of the Interior, in recognition of the area's significant ecological values and the need to protect them. Pub. L. No. 94-258, Title I §§ 102-03, 90 Stat. 303, 303-04 (codified at 42 U.S.C. §§ 6502-03). The Reserves Act created a management structure for the Reserve separate from other public land laws, including the Mineral Leasing Act. 42 U.S.C. § 6502 (withdrawal from entry and disposition under public land laws).

22.     Because of the world-class wildlife and subsistence values of the Reserve, the Reserves Act charges the Secretary of the Interior with protecting the "environmental, fish and wildlife, and historical or scenic values" within the Reserve, 42 U.S.C. § 6503(b), and requires that the Secretary take action to protect and conserve these other resources and uses in the Reserve any time oil and gas leasing, exploration, or development activities may occur. *Id*. §§ 6504(a), 6506a(b).

23.     The Reserves Act requires the Secretary of the Interior to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve. *Id*. § 6506a(b).

24.     Surface values of the Reserve may be protected by limiting, restricting, or prohibiting the use of and access to lands within the Reserve, including within Special Areas. *Id*.; 43 C.F.R. § 2361.1(e)(1).

25.     BLM may reject an oil development proposal if its environmental impacts are too significant, 43 C.F.R. §§ 3162.3-1(h)(2), 3137.73(b), and it may require a suspension of operations and production, 42 U.S.C. § 6506a(k)(2), including if "it is in the interest of conservation" or necessary to "mitigate[] reasonably foreseeable and significantly adverse effects on surface resources," 43 C.F.R. § 3135.2(a)(1), (3).

26.     The Reserves Act further requires the Secretary of the Interior to provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value." 42 U.S.C. § 6504(a).

27.     Regulations in effect when BLM issued its November EA and decision approving the exploration program define "Special Areas" to "mean[] areas within the Reserve identified

by the Secretary or by statute as having significant resource values and that are managed to assure maximum protection of such surface values, to the extent consistent with the requirements of the Act for the exploration and production of the Reserve." 43 C.F.R. § 2361.5 (2024).

28. Before permitting oil and gas activities within Special Areas, BLM must "presume that proposed oil and gas activities should not be permitted unless specific information available . . . clearly demonstrates that those activities can be conducted with no or minimal adverse effects on significant resource values or unless they are necessary to comport with the terms of a valid existing lease." 43 C.F.R. § 2361.40(f) (2024).

29. When preparing an environmental analysis and decision on proposed exploration in Special Areas, BLM is required to "[p]rovide the public with a meaningful opportunity to review and comment, and consider and respond to any relevant comment they receive"; consult with federally recognized Tribes that use the affected Special Area for subsistence or other purposes; and "[e]valuate potential adverse effects and measures to avoid, minimize, or otherwise mitigate such effects to achieve maximum protection of significant resource values." 43 C.F.R. § 2361.40(g)(1)-(3) (2024).

30. BLM is also required to document and provide justification for overcoming the presumption against exploration activities in Special Areas, and "[d]ocument and consider any uncertainty concerning the nature, scope, and duration of potential adverse effects on significant resource values of Special Areas and ensure that any actions taken to avoid, minimize, or mitigate such effects account for and reflect any such uncertainty." 43 C.F.R. § 2361.40(g)(4)-(5) (2024).

31. BLM must also prepare a statement of adverse effects when it "determines that the proposal cannot avoid adverse effects on significant resource values in a Special Area."

43 C.F.R. § 2361.40(g)(6) (2024). The statement must describe the significant resource values that may be adversely affected; the nature, scope, and duration of those adverse effects; measures BLM evaluated to avoid the adverse effects, including whether any practicable alternatives exist that would have less adverse impact on significant resource values; justification for not requiring those measures; measures the BLM will require to minimize, to the maximum extent possible, adverse effects on significant resource values; and measure BLM will require to mitigate any residual adverse effects that cannot be avoided or minimized. *Id.*

32.     On December 17, 2025, BLM's recission of the regulations in place at the time it issued its November EA and decision became effective. 90 Fed. Reg. 51470 (Nov. 17, 2025).

### A.     The Teshekpuk Lake Special Area

33.     Pursuant to its authority, in 1977, the Secretary of the Interior designated regions around Teshekpuk Lake as a Special Area within the Reserve. 42 Fed. Reg. 28723, 28723 (June 3, 1977). In 1998, BLM implemented the first Integrated Activity Plan ("IAP") for the northeast region of the Reserve, which provided the initial surface protections for the Teshekpuk Lake Special Area, and which expanded it to include the Pik Dunes. In 2013, BLM issued a new IAP that again expanded the Teshekpuk Lake Special Area by two million acres to include lands between Nuiqsut and Utqiaġvik that are valued for bird and caribou habitat. In 2020, BLM issued another IAP, which stated it would remove some land from the Teshekpuk Lake Special Area. In 2022, BLM issued the 2022 IAP record of decision ("ROD"), which reverted the Teshekpuk Lake Special Area boundary to what it was under the 2013 IAP. On December 22, 2025, the same day BLM issued the December EA, FONNSI, and decision record for the exploration program, BLM issued the 2025 IAP/ROD, which stated the Teshekpuk Lake Special Area boundaries reverted back to those adopted in the 2020 IAP/ROD.

34.     The Teshekpuk Lake Special Area protects essential caribou habitat, subsistence resources and uses, and world-class water- and shorebird nesting, staging, and molting habitat. Teshekpuk Lake is the largest lake on the North Slope and is located between the communities of Utqiaġvik and Nuiqsut.  The lands around the lake and the lake itself provide important habitat for a wide range of wildlife, including polar bears and yellow-billed loons, and provide some of the most important breeding areas for Arctic shorebirds.

35.     The lands around the lake also provide seasonal range and migratory habitat and forage for the Teshekpuk Caribou Herd.  Caribou from the Teshekpuk Caribou Herd return every year to the lands near Teshekpuk Lake and adjoining coastal areas to give birth to their calves. They also use these lands to seek relief from insect harassment during the summer, and, during most years since 1990, the majority of the Teshekpuk Caribou Herd has overwintered in the Reserve, including the area southeast of Teshekpuk Lake.  The Teshekpuk Caribou Herd is unique amongst Arctic caribou because many of its members use the Reserve year-round.

36.     The Teshekpuk Caribou Herd and other resources in and around the Teshekpuk Lake Special Area are especially important to the primarily Iñupiat community of Nuiqsut. Community members depend on the fish and wildlife of the Reserve, especially in areas within and near the Teshekpuk Lake Special Area, for essential traditional subsistence hunting, trapping, and fishing activities.  The Fish Creek area, which is where much of the exploration program will take place, is an especially important part of the Teshekpuk Lake Special Area because it is one of the only places on the arctic coastal plain where caribou overwinter.

B.      The Colville River Special Area

37.     In 1977, the Secretary of the Interior designated regions around the Colville River as a Special Area within the Reserve.  42 Fed. Reg. at 28723.  The 1998 IAP expanded the

Colville River Special Area to include large portions of the Kikiarorak and Kogosukruk rivers and increased the Special Area boundary to cover 2.44 million acres. The 2013 IAP broadened the purpose of the Special Area to include all raptors. The 2020 IAP stated it would eliminate the Colville River Special Area. The 2022 IAP reinstated the Colville River Special Area as it was under the 2013 IAP. The 2025 IAP/ROD stated it eliminated the Colville River Special Area.

38.     The Colville River Special Area contains important habitat for numerous species, including the Peregrine falcon, and provides crucial subsistence resources for North Slope residents. It is used year-round by the Teshekpuk Caribou Herd, and provides important seasonal range uses and migratory connection between these ranges. The western portion of the Colville River Special Area overlaps with seasonal ranges for the Western Arctic Caribou Herd, and the Central Arctic Caribou Herd also uses the Special Area. It is also used for subsistence harvesting of caribou, fish, and other species.

39.     The Colville River is the largest of Alaska's rivers that flow to the Arctic Ocean. The Colville River and its wetlands also provide the most important raptor nesting habitat on the North Slope and are recognized as one of the most significant regional habitats for raptors in North America. In addition to essential subsistence resources, the region provides a year-round travel corridor for North Slope residents, including for hunting and trapping. The Colville River watershed provides important habitat for moose, fish, furbearers, and other species. The Special Area is also known for its recreational opportunities and world-class paleontological deposits.

**II.** **Process leading up to BLM's approval of ConocoPhillips' 2025-26 exploration program**

    **A.** **Lack of transparency**

    40.    On July 14, 2025, the media reported that ConocoPhillips had submitted applications to BLM to seek authorization for its largest winter exploration program since 2020. As reported, the program would include drilling four new test wells, with three near the Willow development, and a concurrent plan to conduct seismic survey activities across 300 square miles of the Reserve.

    41.    Groups, including some of the plaintiffs, submitted a letter on July 22, 2025, requesting BLM make available to the public the applications, maps, and other documents related to ConocoPhillips' proposed winter drilling and seismic program. BLM did not respond to the July 22 request for more information about ConocoPhillips' proposed seismic and drilling program.

    42.    The Wilderness Society submitted a Freedom of Information Act ("FOIA") request on August 22, 2025, requesting any records related to ConocoPhillips' proposed exploration program. At the time of this filing, BLM has not provided any of the requested documents or further information about ConocoPhillips' exploration program to The Wilderness Society. Throughout the summer and early fall of 2025, a number of emails and phone calls were made to BLM requesting information about ConocoPhillips' exploration program and when the agency would disclose additional information. BLM did not disclose the requested information in response to these emails and calls.

    43.    On October 6, 2025, The Wilderness Society submitted another FOIA request, seeking records specifically related to BLM's winter tundra travel ROPs. At the time of this

filing, BLM has not provided these records to The Wilderness Society.

44. After BLM's failure to respond to these requests for information, on October 9, 2025, The Wilderness Society sent a request directly to ConocoPhillips requesting further information about the winter exploration program. The company refused to provide information about its plans.

**B. Limited opportunity for public involvement, commencement of this action, and BLM's December decision**

45. On November 10, 2025, while the federal government was shut down and just before a federal holiday, BLM published its draft EA for the exploration program.

46. BLM did not notify groups who had specifically requested documents and additional information about the exploration program that it had published the draft EA.

47. BLM provided only one week for the public to comment on the draft EA.

48. On November 12, groups, including some of the plaintiffs here, submitted a letter requesting BLM provide at least 23 additional days for the public to comment on the draft EA.

49. Groups also requested in the November 12 letter that BLM respond to the request by November 14.

50. BLM did not respond to the request for extension of the comment period.

51. On November 17, plaintiffs and other groups submitted comments on BLM's draft EA.

52. On November 26, just before 6PM mountain time the day before another federal holiday, BLM published its first final EA and FONNSI, and decision record approving ConocoPhillips' exploration program.

53. BLM did not contact plaintiffs to notify them that the November EA had been

published.

54.    The November EA purported to respond to public comments, including by stating that the EA contained an appendix Z with BLM's responses to public comment, but there was no appendix Z included with the EA.  The appendices for the November EA ended at appendix J.

55.    On November 28, groups emailed BLM an additional letter, which attached two reports relevant to the exploration program.

56.    On December 11, plaintiffs filed their complaint challenging BLM's November decision to approve the exploration program and filed their motion for a preliminary injunction.

57.    On December 23, less than a month after BLM issued its November EA and decision, and less than two weeks after plaintiffs initiated this lawsuit, the agency published its second final EA, FONNSI, and decision record.

58.    BLM did not contact plaintiffs to notify them that the agency was planning to issue the December EA, FONNSI, and decision record.

59.    BLM did not provide the public with an opportunity to comment on the December EA.

60.    BLM included in the December EA a very brief response to public comments on the draft EA.

### III.    ConocoPhillips' exploration program

61.    ConocoPhillips' exploration program includes a seismic survey and drilling and plugging and abandonment program that would occur adjacent to two existing developments that are either under construction (Willow) or in the production phase (Greater Mooses Tooth 1) in the Reserve.

### A. Seismic survey

62. As approved, the seismic survey area covers 192,000 acres, with the full project area consisting of approximately 467 square miles.

63. Access to the seismic survey area relies in part on seasonal and permanent infrastructure built to support ongoing construction of the Willow project. Adjacent to that infrastructure, ConocoPhillips plans to build a 360,000-square-foot ice pad for staging. From its ice pad, ConocoPhillips would build a 10.1-mile-long snow trail across the tundra, to access the seismic survey area.

64. From the end of the snow road, ConocoPhillips would no longer use ice roads or snow roads, instead deploying its seismic equipment and personnel onto the tundra and whatever snow cover, if any, exists at that time.

65. The mobile camp to support the seismic activities would host up to 200 personnel. The camp could consist of 40 ski-mounted trailers, 8-10 strings of trailers with 4-5 trailers each, being hauled by heavy equipment across the tundra. The camp could consist of a kitchen, diner, sleeping areas, washroom, laundry, offices, generator, medical clinic, and storage. The camp could also include mobile fuel tanks, a water maker and incinerator, tractors, loaders, and other machines and heavy equipment.

66. According to the final EA, the seismic mobile camp would move every 2-6 days, following a generally north to south direction, covering approximately 45 miles, and generally follow the same route in and out of the survey area. The 10.1-mile snow road leading to the survey area, and six airstrips built on lakes within the survey area, would be used for camp resupply and other purposes.

67. The vibroseis survey activities include the use of vibroseis vehicles and wireless

recording devices. The vibroseis vehicles would move across the survey area following grid lines approximately 660 feet apart, generating subsurface seismic waves every 20-65 feet. The recording devices, or receivers, would be placed in lines that run perpendicular to the vibroseis vehicle lines, also with approximately 660 feet spacing between lines. The result is a grid-like pattern, with vehicles, equipment, and personnel following the perpendicular vibroseis and grid lines across the survey area.

68.     Seismic operations are planned to continue 24 hours per day until demobilization, utilizing light plants, pump houses, and generators to light and power operations throughout the nights.

69.     Winter seismic operations would be followed by low-level (<500 feet above ground level) summer helicopter activities, and potentially hundreds of takeoffs and landings, in the same area.

70.     A substantial portion of the seismic survey and related activities would occur within the Colville River Special Area.

### B.     Drilling and plugging and abandonment

71.     Operations for the drilling and plugging and abandonment program would also rely in part on existing seasonal and permanent infrastructure from the construction of Willow development, and existing infrastructure from the Greater Mooses Tooth 1 development. Both the west and east explorations, as they are described in the final EA, would also include project specific construction of approximately 58 miles of ice roads for access to the drilling sites. These activities also include the construction of more than a dozen ice pads, ranging in size from 40,000 to 1,000,000 square feet.

72.     Well drilling and plugging and abandonment operations would include movement

of camps and similar types and amounts of equipment as described above for the seismic mobile camp, together housing an average of 550 personnel at any one time. To support these operations, BLM estimates there would be 5,000 vehicle round trips occurring back and forth across the temporary and permanent infrastructure, over the period of about four months, and the burning of nearly 3,000,000 gallons of fuel over the course of the winter season. These operations also include the erection and operation of drill rigs, multiple communication towers ranging from 45 to 120 feet in height, and light towers and other light, noise, and emissions producing drilling and camp equipment.

73. Winter drilling and plugging operations would be followed by low-level (<500 feet above ground level) summer helicopter activities, and potentially hundreds of takeoffs and landings, in the same area.

74. Three of the proposed drill sites—and their associated ice roads and traffic, ice pads and camps, personnel and vehicles, and related equipment, supplies, and helicopter activities—would occur within the Teshekpuk Lake Special Area.

## IV. Impacts from the exploration program

75. Plaintiffs and other groups submitted comments on the draft EA describing the long-term impacts the exploration program could have on vegetation and tundra and related systems, and on the Teshekpuk Caribou Herd. In addition, scientific and subject matter experts determined the exploration program is likely to cause long-term impacts to vegetation and tundra and related systems, to the Teshekpuk Caribou Herd, and to subsistence resources.

### A. Long-term and cumulative impacts from seismic and other tundra travel activities

76. Commenters on the draft EA described how seismic and other tundra travel

activities result in areas of long-term, and in some cases permanent, alteration of landscape and vegetation.

77.     Mr. Mike Pilson, a former geologist for ConocoPhillips, submitted into the administrative record for BLM's draft EA a report explaining how the draft EA did not discuss or provide plans for how ConocoPhillips would cross the Kogosukruk and Kikiakrorak rivers, which are located within the seismic survey area and which have steep river embankments in that area.  Due to the topography of these river valleys in the seismic survey area, Mr. Pilson determined traversing these rivers with the seismic survey equipment would be difficult to do without causing severe damage to the riverbanks.

78.     Dr. Martha K. Raynolds submitted into the administrative record for BLM's draft EA a report that showed that thousands of acres of vegetation would remain damaged from the seismic survey activity after one year, more than 600 acres would be damaged after six years, and more than 260 acres after 15 years.  Dr. Raynolds also concluded these impacts were exacerbated by the effects of climate change, resulting potentially in even greater impacts than forecasted by existing studies.

79.     Dr. Matt Nolan also submitted into the administrative record for BLM's draft EA a report based on detailed airborne photogrammetric mapping of areas adjacent to and overlapping the exploration program area.  Through observations made during photogrammetric mapping and digital elevation modeling of the area, Dr. Nolan concluded winter seismic operations result in both visual and functional damage to vegetation and soils that last decades.

80.     Commenters on the draft EA described how cumulative impacts from seismic exploration continue to grow and outpace recovery of impacts from past seismic activities, and how cumulative disturbance of large areas with even minor impacts from seismic activities, and

small areas with greater disturbance, result in long-term changes to species composition of vegetation communities.

81.    BLM previously recognized that impacts from seismic activities can take decades to recover, and that repeated heavy vehicle traffic can result in community successional changes, which in turn can reduce habitat value for foraging species like caribou.

82.    BLM has permitted more acres of seismic activity than were anticipated in the analysis supporting the agency's adoption of the 2020 and 2022 IAPs.

83.    Multiple studies agree that heavy vehicles and equipment involved in camp moves cause more severe and long-lasting disturbance than seismic vehicles used for survey activities.  These camp moves have been found to cause permanent impacts due to disturbance from the use of heavy equipment such as bulldozers.

84.    Agency documents also acknowledge the mobile camps used for seismic operations cause greater impacts on tundra vegetation than other seismic activities.

85.    The draft EA acknowledged as well that camp move trails have been shown to persist for decades.

86.    Dr. Raynolds also concluded that seismic mobile camps cause the greatest damage to tundra, vegetation, and related systems.

### B.    Population-level impacts on the Teshekpuk Caribou Herd

87.    Drs. Anne Gunn and Gary Kofinas, with their colleague Mr. Donald Russell ("Gunn *et al.*"), submitted into the administrative record for BLM's draft EA a report that determined the exploration program, as proposed in the draft EA, would likely cause population-level impacts to the Teshekpuk Caribou Herd.  Specifically, Gunn *et al.* concluded impacts from the exploration program would add to the impacts caused by ongoing construction of the Willow

project, which are more likely than not to result in changes in the Teshekpuk Caribou Herd's "distribution and movements, resulting in greater energetic costs to caribou, and having a negative effect on pregnancy and calf survival rates." Gunn *et al.* determined the impacts from the concurrent traffic, construction, and other activities caused by the exploration program would "be more likely than not to be at least the same, if not greater, than the likely impacts" that would occur from Willow construction alone.

88. Commenters on the draft EA also described the long-term impacts to the Teshekpuk Caribou Herd that could occur from the exploration program. The ground and air vehicle traffic and disturbance caused by the exploration program will cause disruption of the Teshekpuk Caribou Herd's spring, winter, summer, and fall migration patterns. These disruptions are more likely than not to result in population-level harm to the herd.

### C. Long-term impacts on the availability and abundance of caribou for subsistence uses

89. The exploration program could adversely affect the availability and abundance of caribou for subsistence hunting. Caribou, including those of the Teshekpuk Caribou Herd, provide daily sustenance for North Slope communities. Some families eat more caribou than whale, and it is a staple of their diet. There is a sharing culture that relies on hunters to provide caribou meat for themselves, for their families, and for elders to get through the year. There are "super hunters" in the communities who are invested in providing enough food to supply many families in North Slope communities. If these hunters are unable to harvest caribou because they have been deflected or displaced by oil and gas exploration or other activities, families and the community suffer harm.

90. Displacement of, or reduced forage for, caribou of the Teshekpuk Caribou Herd

will cause adverse effects to subsistence hunters and to the food security of families and communities that they support. If super hunters cannot get enough caribou to feed their extended family and neighbors, the impacts to the community can be severe and far reaching.

91.     The likely population-level impacts to the Teshekpuk Caribou Herd, described by Gunn *et al.*, will have likely adverse effects on the availability and abundance of these caribou for subsistence hunters and the communities and families they support.

## V.     BLM's measures to mitigate impacts to vegetation and to the Teshekpuk Caribou Herd

92.     In its November and December EAs and FONNSIs, BLM relies on ROP C-2 to avoid and mitigate impacts to vegetation from seismic and other tundra travel activities. The agency relies on ROP M-1 to avoid and mitigate impacts on the Teshekpuk Caribou Herd. BLM also relies on ROPs C-2, C-3, and C-4 to mitigate impacts from stream crossings. Expert analysis and comments submitted on the draft EA demonstrate that these measures are ineffective.

### A.     ROP C-2

93.     ROP C-2, as described in the 2022 IAP/ROD, states "[g]round operations shall be allowed only when frost and snow cover are at sufficient depths to protect the tundra."

94.     ROP C-2, as described in the 2025 IAP/ROD, states "Off-road travel will be allowed by the BLM [] when soils are frozen to sufficient depth (defined by a soil temperature of 23 degrees Fahrenheit or lower at a depth of 12 inches), and 6 inches of snow cover exists."

95.     In both the November and December EAs, BLM defines sufficient snow depth as six inches of snow.

96.     BLM uses remote monitoring stations to determine average snow depths and to

determine whether to permit off-road, tundra travel activities in the Reserve.

97.     Drs. Glenn E. Liston and Katherine B. Gura submitted into the administrative record for BLM's draft EA a detailed analysis and report that showed, through independent modeling, that most of the Reserve, including specifically the areas where the exploration program would occur, is covered by less than six inches of snow for much of the winter.  Drs. Liston and Gura determined that "if one were to measure snow depth at only a couple of sites within the [Reserve], collected measurements likely would not reflect the heterogeneity in snow depth that characterizes this area."  In such a situation, they determined "it is highly unlikely that the entire area would contain snow depths [greater than] 6 inches."

98.     In addition, through airborne photogrammetry and snow-depth mapping and modeling, Dr. Nolan's analysis documents that 70% of the landscape in the 2021 mapping area in the Reserve—which is adjacent to and overlapping partially with the proposed seismic survey area—had late-winter snow shallower than 15 cm (6 in.).

99.     These analyses and other evidence show that adequate snow, as defined by BLM in its final EAs, does not occur at a uniform or landscape-scale during the time period when seismic and exploration travel is authorized.  Snow cover in the Reserve often falls below the threshold BLM relies on to avoid impacts to tundra, and no single average or point measurement of snow can demonstrate that six inches of snow exists along the full length of travel of seismic and other tundra travel vehicles.

**B.     ROP M-1**

100.    ROP M-1, as described in the 2022 IAP/ROD states, "Chasing wildlife with ground vehicles is prohibited.  Particular attention will be given to avoid disturbing caribou."  Gunn *et al.* concluded it is "uncertain how [ROP M-1] and its objective are compatible with the

combined scale of exploration and construction" on the Teshekpuk Caribou Herd's winter range, and notice "BLM provide[d] no basis to conclude that this ROP, or its underlying objective, can operate effectively under the expansive exploration and construction footprint proposed" in the Teshekpuk Caribou Herd's winter range. Lacking evidence that ROP C-1 would be effective here, Gunn *et al.* concluded "the project leaves substantial issues unresolved and heightens the likelihood of significant impacts."

101.    Comments on the draft EA similarly concluded that ROP M-1 lacked guidance, direction, enforcement, monitoring, or other requirements to describe what it means to avoid disturbing caribou.

102.    ROP M-1, as described in the 2025 IAP/ROD states, "Permittees will submit a vehicle use plan with their permit application for approval by the [Authorized Officer]. The [Authorized Officer] may waive this requirement for minimally impactful activities."

103.    ROP M-1, as described in the 2025 IAP/ROD, states "Following wildlife with ground vehicles is prohibited. Particular attention would be given to avoid disturbing caribou." The ROP lists other elements to be included in vehicle use plans.

**C.    ROPs C-2, C-3, C-4 as applied to stream crossings**

104.    In addition to ROP C-2's snow depth standard, it also includes performance standards for the protection of stream banks. ROP C-3 requires the crossing of waterways to "be made using a low-angle approach." ROP C-4 requires water crossings to occur at "areas of grounded ice whenever possible."

105.    Given the depth and steepness of the Kogosukruk and Kikiakrorak rivers within the seismic survey area, Mr. Pilson determined it was not apparent how ConocoPhillips could comply with the provisions of ROPs C-2, C-3, and C-4 when crossing these rivers. Mr. Pilson

explained, for example, that it was unclear, based on the draft EA, how ConocoPhillips could achieve a low-angle approach and soil-free snow or ice ramps as required by ROP C-3. Without cross-sectional designs or specific planning for the crossings, Mr. Pilson concluded, the efficacy of these ROPs to protect the Kogosukruk and Kikiakrorak river embankments was unclear.

## VI. Mitigation measures that would have avoided, minimized, or reduced impacts from the exploration program

106. Commenters and scientific and subject-matter experts raised with BLM, before it issued its decisions, a host of measures that would have avoided, minimized, or reduced some impacts from the exploration program.

107. Dr. Raynolds recommended requiring aerial snow depth mapping, using snow water equivalent to measure snow depths, ongoing evaluation and reporting of snow conditions, and routing camp-move trails and snow and ice roads to areas having the highest snow water equivalent measurements. Dr. Raynolds explained that each of these potential measures, except snow depth mapping, were included in alternatives B-D as considered in the 2020 IAP/EIS.

108. Dr. Nolan recommended a suite of mitigation measures to avoid, minimize, or reduce seismic and other tundra travel impacts on vegetation, tundra, and related systems. Among others, these include using at least three years of snow thickness measures as acquired from airborne photogrammetric operations, to plan for seismic lines, roads, and camps to avoid areas where more than 25 centimeters (10 inches) of snow cover over tussock tops has not occurred. Dr. Nolan also recommended prohibiting u-turns by exploration equipment off ice roads and requiring a minimum turn radius for all seismic vehicles, to reduce ruts and vegetation impacts.

109. Mr. Pilson recommended BLM conduct specific analysis and planning before

authorizing ConocoPhillips to cross the Kogosukruk and Kikiakrorak rivers with seismic and camp equipment vehicles. This would include mapping crossing locations and development of cross-sectional designs and slope criteria.

110.    Commenters also recommended a number of measures to avoid impacts from the exploration program. To avoid the greatest impacts of the seismic program—from camp moves and equipment—commenters urged BLM to consider requiring ConocoPhillips to plan and build a single snow road into the seismic survey area. BLM plans to use snow roads for other components of the exploration program, including for access to the seismic survey area. Using a snow road to support seismic camp equipment and vehicles would provide the same route for ingress and egress for camp equipment and vehicles and would keep the higher ground pressure and heavy camp support equipment on the reinforced snow road. This would avoid the greatest impacts from seismic activities.

111.    Commenters also urged BLM to consider the increased use of Uni Vibe, lower ground pressure vehicles, which are already planned to be used for some seismic activities, and which manufacturer information shows are powerful yet compact seismic vibroseis vehicles designed to be used in environmentally sensitive areas.

112.    Commenters urged BLM to adopt known measures described for alternatives B-D in the 2020 IAP/EIS, which would further avoid impacts from the seismic operations.

113.    Commenters also urged BLM to consider an alternative that authorized fewer or no wells within the Teshekpuk Lake Special Area. This would be accomplished either by denying one or more of the wells proposed in the Special Area, or by using directional drilling techniques to access the drill targets from outside the Special Area. Multiple industry and agency documents and articles show the feasibility of directional drilling, including in the Arctic,

and how the technology has been used to allow for oil and gas operations while reducing environmental impacts in sensitive areas.

114.    Commenters also proposed that BLM delay its decision on the winter exploration program until next winter, so that BLM could assess the existing data and expert information provided by commenters.  This would allow BLM the opportunity to assess the inadequacies in its mitigation measures and to plan and develop measures to avoid impacts form the exploration program (*e.g.*, developing measures to account for the heterogenous nature of snow cover in the Reserve and planning for the crossings of Kogosukruk and Kikiakrorak rivers).

## VII.    BLM's analysis and conclusions about impacts and its mitigation measures

115.    BLM published the November EA, FONNSI, and decision record approving the exploration program on November 26, 2025.  BLM published its December EA, FONNSI, and decision record approving the exploration program on December 23, 2025.

### A.    The November EA

116.    In the final November EA, BLM determined subsistence resources would be "[m]inimally [i]mpacted."  Relying on ROP M-1 and others to provide protection to subsistence resources, BLM determined impacts to subsistence "would be expected to be minimal and short term."

117.    BLM determined the exploration program would only "temporarily disturb and displace" caribou from the exploration program area, and that protections are provided by the 2022 IAP/ROD ROPs.

118.    For soils and vegetation, BLM relied on ROP C-2, among others, and determined these resources could be potentially impacted by the exploration program.

119.     BLM acknowledged that impacts to vegetation would depend in part on the level of disturbance and on snow conditions, and it acknowledged its reliance on delaying tundra travel activities until "an average of six inches" of snow depth had occurred.

120.     BLM concluded impacts from seismic survey lines "are expected to be minor and vegetation would generally recover rapidly from low intensity disturbance."

121.     In regard to all exploration program activities, BLM concluded that "expected impacts to vegetation would be minor and would be further minimized through applicable mitigation measures."

122.     For impacts to soils, BLM relied on ROP C-2 to mitigate impacts and defined "adequate snow" for the purpose of the ROP "as 6 inches average depth."

123.     Based on ROP C-2, BLM determined potential impacts to soils from construction of snow roads and camp trails would "be expected to be minimal."

124.     BLM determined that soil impacts from seismic survey lines "would recover relatively rapidly."

125.     BLM concluded that "expected impacts to soils and permafrost would be dispersed and any impacts would be minimized through applicable mitigation measures."

126.     The final EA includes a list of resource sections in the EA that were updated as a result of public comments received by the agency. That list does not include vegetation resources.

127.     In the final EA, BLM included appendix D, which it titled "Statement of Adverse Effect."

128.     BLM acknowledged in the statement of adverse effect that caribou of the Teshekpuk Caribou Herd are an important subsistence species for Alaska Native hunters from

multiple communities. BLM acknowledged that important migration pathways for the Teshekpuk Caribou Herd intersect with the exploration program area, and that caribou during all life stages could be encountered in the exploration program area.

129. BLM concluded that, while impacts to caribou are expected, they are expected to be minimal to moderate, and temporary.

130. BLM concluded, "[a]ny impacts would be minimized through applicable mitigation measures."

131. BLM acknowledged there "were no additional mitigation measures evaluated that were not carried forward."

132. In its statement of adverse effect, BLM did not discuss any additional measures to avoid adverse effects of its decision, or whether any practicable alternatives exist to lessen adverse effects on significant resource values.

133. BLM did not provide any justification for not requiring additional measures to minimize adverse effects on significant resource values, though it did acknowledge it was required to describe such measures.

**B.    BLM's November FONNSI**

134. In its November FONNSI, BLM determined the exploration program would have no new significant impacts beyond those assessed in the 2020 IAP/EIS, and that impacts from the exploration program "would be expected to be minimal to moderate and temporary."

135. BLM determined "the stipulations, [ROPs], and operator committed measures are expected to reduce the impact of potential short and long term effects."

136. BLM concluded the exploration program is not expected to result in long term effects.

137. Citing ROPs C-1 and M-1, BLM determined disturbance and displacement of caribou and other terrestrial wildlife species would be temporary.

138. For vegetation and soils, BLM concluded the effects of the exploration program would be "dispersed," and that "effects would likely [] be distributed throughout the project area over higher/drier areas and wind scoured surfaces with lower snow."

139. BLM states "[s]ome compression of the insulating vegetative mat would be expected along the camp move trails."

140. BLM concluded "expected impacts to vegetation would be minor, and expected impacts to soils and permafrost would be dispersed and any impacts would be minimized through applicable mitigation measures."

### C. BLM's November decision record

141. In its November decision record, BLM determined that all potential impacts assessed in the final November EA are mitigated by the ROPs.

142. BLM stated it identified additional mitigation measures as part of its resource analyses.

143. BLM did not explain how continued reliance on existing ROPs will mitigate the impacts raised in public comments and by scientific and subject matter experts.

144. BLM did not address the comments and expert analysis demonstrating its mitigation measures are ineffective and inadequate to mitigate significant adverse effects.

145. BLM did not discuss in its decision record the numerous mitigation measures raised by commenters and by scientific and subject matter experts.

146. BLM approved the applications for permits to drill, seismic exploration permit, plugging and abandonment, and right-of-way grant on November 26, 2025.

**D.    BLM's December EA, FONNSI, and decision record**

147.    On December 23, 2025, BLM published its December EA, FONNSI, and decision record approving the exploration program again.

148.    The November decision and consequent authorizations remained operative at the time of the December decision.

149.    The December documents did not remedy the flaws of the November documents.

**CLAIMS FOR RELIEF**

**COUNT I**

**(RESERVES ACT/ADMINISTRATIVE PROCEDURE ACT—FAILURE TO ASSURE ADEQUATE MITIGATION OF SEISMIC AND TUNDRA TRAVEL IMPACTS AND TO PROVIDE MAXIMUM PROTECTION)**

150.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

151.    The Reserves Act charges the Secretary of the Interior with protecting the "environmental, fish and wildlife, and historical or scenic values" within the Reserve.  42 U.S.C. § 6503(b).  For all activities undertaken pursuant to the Act, the Secretary "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]."  *Id.* § 6506a(b).  The Secretary also must provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value."  *Id.* § 6504(a).

152.    The Administrative Procedure Act ("APA") bars an agency from arbitrary and capricious decisionmaking, including reliance on factors Congress did not intend it to consider, failure to consider an important aspect of the problem, failure to analyze compliance with

governing legal requirements, failure to explain conclusions rationally, and failure to respond to properly raised public comments that bear on the agency's consideration of relevant factors or adoption of a proposed decision.  5 U.S.C. § 706(2)(A).

153.    The record demonstrates the exploration program as approved will have significant adverse effects on the vegetation and soils of the Reserve.

154.    Evidence submitted to the agency demonstrates the exploration program will cause long-term impacts to vegetation and soils where seismic and other tundra travel activities will occur.

155.    BLM relies on ROP C-2 to mitigate impacts from seismic and other tundra travel related activities.

156.    Expert analysis demonstrates ROP C-2 is ineffective to avoid long-term impacts from seismic and other tundra travel activities.

157.    BLM did not discuss or analyze the feasible mitigation measures submitted in public comment and by scientific and subject matter experts, which would have avoided or lessened the impacts from seismic and other tundra travel activities authorized by BLM's decisions.

158.    By failing to address the inadequacy of ROP C-2 before issuing its decisions, BLM has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

159.    By failing to consider feasible mitigation measures that would have avoided or lessened the impacts of the exploration program, BLM has unlawfully failed to condition,

restrict, or prohibit ConocoPhillips' exploration program in order to mitigate adverse effects and assure maximum protection. 42 U.S.C. §§ 6504(a), 6506a(b); 43 C.F.R. § 2361.40(g)(3), (6)(iii)-(v) (2024).

160.    Defendants' decision to approve ConocoPhillips' exploration program while relying on ROP C-2 to assure adequate mitigation and maximum protection, and to ensure compliance with 42 U.S.C. §§ 6504(a) and 6506a(b), and 43 C.F.R. § 2361.40(g) (2024), is arbitrary, capricious, and otherwise not in accordance with the law in violation of the Reserves Act and the APA, 5 U.S.C. §§ 702, 706.

### COUNT II

### (RESERVES ACT/APA—FAILURE TO ASSURE ADEQUATE MITIGATION OF IMPACTS TO THE TESHEKPUK CARIBOU HERD AND TO PROVIDE MAXIMUM PROTECTION)

161.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

162.    The Reserves Act charges the Secretary of the Interior with protecting the "environmental, fish and wildlife, and historical or scenic values" within the Reserve. 42 U.S.C. § 6503(b). For all activities undertaken pursuant to the Act, the Secretary "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]." *Id.* § 6506a(b). The Secretary also must provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value." *Id.* § 6504(a).

163.    The APA bars an agency from arbitrary and capricious decisionmaking, including

reliance on factors Congress did not intend it to consider, failure to consider an important aspect of the problem, failure to analyze compliance with governing legal requirements, failure to explain conclusions rationally, and failure to respond to properly raised public comments that bear on the agency's consideration of relevant factors or adoption of a proposed decision. 5 U.S.C. § 706(2)(A).

164.    The record demonstrates the exploration program as approved will have significant adverse effects on the Teshekpuk Caribou Herd.

165.    Evidence submitted to the agency demonstrates the exploration program would likely cause population-level impacts to the Teshekpuk Caribou Herd, and, in turn, cause long-term impacts on the availability and abundance of caribou for subsistence uses.

166.    BLM does not address in its EAs or other decision documents the scientific evidence demonstrating the exploration program is likely to cause population-level impacts to the Teshekpuk Caribou Herd.

167.    BLM relies on ROP M-1 to mitigate impacts to caribou from the exploration program.

168.    Evidence submitted to BLM demonstrates ROP M-1 is ineffective to avoid significant adverse impacts to the Teshekpuk Caribou Herd.

169.    BLM did not discuss or analyze the feasible mitigation measures submitted in public comment and by scientific and subject matter experts, which would have avoided or lessened the impacts from the exploration program.

170.    By failing to assess impacts to the Teshekpuk Caribou Herd, and to address the inadequacy of ROP M-1 before issuing its decision, BLM has failed to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

171. By failing to consider feasible mitigation measures that would have avoided or lessened the impacts of the exploration program, BLM has unlawfully failed to condition, restrict, or prohibit ConocoPhillips' exploration program in order to mitigate adverse effects and assure maximum protection. 42 U.S.C. §§ 6504(a), 6506a(b); 43 C.F.R. § 2361.40(g)(3), (6)(iii)-(v) (2024).

172. Defendants' decisions to approve ConocoPhillips' exploration program while relying on ROP M-1 to assure adequate mitigation and maximum protection, and to ensure compliance with 42 U.S.C. §§ 6504(a) and 6506a(b), and 43 C.F.R. § 2361.40(g) (2024), is arbitrary, capricious, and otherwise not in accordance with the law in violation of the Reserves Act and the APA, 5 U.S.C. §§ 702, 706.

## PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully request that the Court:

A. Declare that defendants have violated the Reserves Act and APA, and further declare that the actions set forth above are arbitrary, capricious, and not in accordance with law;

B. Vacate the decision records approving the 2025-26 exploration program;

C. Enter injunctive relief to ensure that defendants comply with the Reserves Act and APA to prevent irreparable harm to plaintiffs and to the environment until such compliance occurs; and

D. Grant such other relief as the Court considers just and proper, including plaintiffs' costs of this action and reasonable attorneys' fees.

Respectfully submitted this 29th day of December, 2025.

_s/ Ian S. Dooley_
Ian S. Dooley (Alaska Bar No. 2006059)
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: idooley@earthjustice.org

_s/ Erin Colón_
Erin Colón (Alaska Bar No. 1508067)
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: ecolon@earthjustice.org

_s/ Erik Grafe_
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: egrafe@earthjustice.org

_Attorneys for Plaintiffs Sovereign Iñupiat for a Living Arctic, Center for Biological Diversity, and The Wilderness Society_