


# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Alaska State Office
222 West Seventh Avenue, #13
Anchorage, Alaska 99513-7504
www.blm.gov/alaska

In Reply Refer To:
AKAA094166
Re: Tinmiaq #19
3160 (AK932)

CERTIFIED MAIL – Return Receipt Requested

Conoco Phillips Alaska Inc.
PO Box 100360
Anchorage, AK 99510-0360
Attn: Jason Parker

Dear Mr. Parker:

Attached is an update to the Permit to Drill (APD) for Tinmiaq #19 (APD ID 10400107969) which was approved November 26, 2025.

Based on the significant changes to the Department's management of the National Petroleum Reserve in Alaska (NPR-A) that have now taken effect a few weeks after the initial decision, the Bureau of Land Management intends to update the decision to reflect the changes to your Conditions of Approval for the Surface Use Plan of Operations (SUPO) for the approved APD.

Specifically, since the BLM's decision on November 26, 2025, the following developments have occurred that impact management of the NPR-A:

-On December 5, 2025, the President signed S.J. 80, a joint resolution providing for congressional disapproval of the 2022 NPR-A Integrated Activity Plan Record of Decision, which became Public Law No. 119-47.

-On December 17, 2025, the final rule, published on November 17, 2025, entitled "Rescission of the Management and Protection of the National Petroleum Reserve in Alaska Regulations, Issued May 7, 2024," 90 F.R. 51470, became effective.

- On December 22, 2025, the 2025 National Petroleum Reserve -Alaska Integrated Activity Plan Record of Decision was signed and became effective.

While the new developments in NPR-A management authorities do not require BLM to make a new or different decision, the BLM thinks it most appropriate to do so in this instance, given the significance of the programmatic changes coming so close after the initial decision.

If you have any questions, please contact Robert Brumbaugh , Acting Branch Chief of Energy and Minerals from my staff at (907) 271-4429 or rbrumbau@blm.gov.

Sincerely,

WAYNE SVEJNOHA
Digitally signed by WAYNE SVEJNOHA
Date: 2025.12.22 14:39:52 -09'00'

Wayne Svejnoha

Deputy State Director, acting

Enclosures: ConocoPhillips 2025-2026 Drilling and Plugging Program, Applications for Permit to Drill Stipulations and Required Operating Procedures

# ConocoPhillips 2025-2026 Drilling and Plugging Program Applications for Permit to Drill Stipulations and Required Operating Procedures

## Project Specific Stipulations

1. The operator shall provide data from GPR and/or manually drilled holes demonstrating a comparison of ice thickness between the ice airstrip and adjacent lake ice. One set of data would need to document conditions during initial construction (i.e., pre-impact) and another set of data should show conditions at the end of the season. Data should be collected at the same locations during both time periods.

## Administrative Stipulations

2. The authorized user is responsible for obtaining all required permits and authorizations. Authorized users will follow all Federal and State of Alaska laws and regulations and will comply with all applicable Federal and State of Alaska environmental standards.

3. Authorized user shall provide BLM with a detailed map of all ice roads, ice pads, and snow trails used accurately on a USGS quadrangle map of the 1:63,360 scale. Data shall be transmitted to the BLM in a GIS format (ESRI shapefiles referencing the North American Datum of 1983).

4. The BLM, through the Arctic District Manager, reserves the right to impose closure of any area to operators in periods when fire danger or other dangers to natural resources are severe.

5. It is the responsibility of the authorized user to ensure that all individuals brought to the project area under its auspices adhere to these stipulations. Authorized users of the planning area shall provide all employees, contractors, subcontractors, and clients with a briefing regarding stipulations applicable to the lease and/or permit.

6. A copy of applicable stipulations will be posted in a conspicuous place in each work site and campsite.

7. The authorized user will provide the BLM Arctic District Office with a weekly activities' summary report using the format provided by BLM. This report shall include all required reports identified below. The report shall be delivered in digital format every Mo through the applicable season(s) for the life of this project.

8. Tundra damage shall be reported to the BLM within 24 hours during operations or within 72 hours during summer inspections to blm_ak_arctic_permitting@blm.gov.

9. A daily record of water removed as unfrozen water or ice aggregate (separately) must be maintained and submitted to the BLM with the weekly report of activities. Submitting water and ice use in the format specified by the BLM is required.

10. The BLM must be notified within 48 hours if water removal exceeds the volume approved at any lake.

11. The BLM must be notified within 48 hours of any observation of dead or injured fish on source intake screens, in the hole being used for pumping, or within any portion of ice roads or pads. If observed at a particular lake, pumping must cease temporarily from that hole until additional preventive measures are taken to avoid further impacts on fish.

12. The authorized user shall maintain an aircraft log of the following information for each take-off and landing (which shall be turned in to BLM in electronic format in an excel spreadsheet with each item below listed in a separate column no later than November 1, each year):

> Type of Aircraft
> Aircraft N number
> Date
> Time
> Decimal Degree Format – latitude of takeoff location
> Decimal Degree Format – longitude of takeoff location
> Date
> Time
> Decimal Degree Format – latitude of landing location
> Decimal Degree Format – longitude of landing location

13. For projects that use aircraft to access numerous sites and locations, the Authorized user shall provide BLM with a map, GPS tracks of flights, and the landing locations at the conclusion of the activity. This should be submitted at the same time as the aircraft log.

14. The authorized user must use products that are approved and certified by the Interagency Grizzly Bear Committee (IGBC) as 'bear-resistant' for the storage of all human food. Use of IGBC-certified bear-resistant containers is one of the methods available to comply with food storage regulations. Other methods for compliance may also be considered for approval in some circumstances, for instance electric fencing may be authorized under certain conditions. Information about certified products can be found at: http://www.igbconline.org/index.php/safety-in-grizzly-country/bear-resistant-products/igbc-certified-bear-resistant-products.

15. The authorized user and designees will cooperate with the Service and other Federal, State, or local agencies designated to represent the Service to monitor impacts of project activities on polar bears. For example, the authorized user and designees will allow Service personnel access to the activity site upon request.

16. All field crews will follow a Wildlife Interaction Plan prepared by the authorized user detailing how crews will manage wildlife attractants (food and non-food materials) and respond to human- polar bear interactions. This interaction plan will include all guidelines for safely and non- lethally deterring polar bears from damaging property and endangering the public as found in the Final Rule of the Marine Mammal Protection Act Deterrence Guidelines. Other methods of deterring polar bears require authorization by the MMM office. Contact Stephanie Burgess at 907-223-9172 for more information.

17. If a polar bear interaction escalates into a life-threatening situation, section 101(c) of the MMPA allows, without specific authorization, to take (including lethal take) a polar

**Exhibit 5 - Page 4 of 23**

bear. Any injury or lethal take of a polar bear must be reported to the BLM (907-474-2301) and the Service (907-223-9172) within 48 hours

18. The authorized user or their contractors shall submit a Polar Bear Sighting Report to the BLM and Service within 60 days of the completion of field operations. This report shall contain information on all evidence of polar bears, including active den locations, and the actions taken by the authorized user. One polar bear report is meant to be completed per observation. The BLM (907-474-2301) and the Service (907-223-9172) will be notified within 24 hours of any potential or observed polar bear den sites.

## Standard Stipulations

19. Grey wash water and kitchen wastewater may be filtered to remove the solids and the liquid discharged to the land surface, provided the disposal area is a minimum of 100 feet from any water body or stream.

20. The Authorized user accepts responsibility for their campsite conditions and will be liable for identified rehabilitation activities.

21. All operations shall be conducted with due regard for good resource management and in such a manner as not to block any stream, or drainage system, or change the character or course of a stream, or cause the pollution or siltation of any stream or lake.

22. The authorized user will take no action that interferes with subsistence activities of rural users or restricts the reasonable access of subsistence users to public lands. This may include but is not limited to disturbance of wildlife and their movements near subsistence hunters, and damage to cabins, trails, traditional campsites or caches used by subsistence users. The authorized user must familiarize themselves, their team, and their pilots with any subsistence camps and cabins located near their project site (map available upon request) and, when using aircraft, make all reasonable efforts to avoid disturbing hunters.

23. All activities shall be conducted to avoid or minimize disturbance to vegetation. The clearing of vegetation for camps or aircraft landing areas is prohibited.

24. In accordance with the Archaeological Resources Protection Act (16 U.S.C. 470aa), the removal or disturbance of archeological or historic artifacts is prohibited. The excavation, disturbance, collection, or purchase of historical, recent, ethnological, or archaeological specimens or artifacts is prohibited. Such items include both prehistoric and historic archaeological sites and associated artifacts, including but not limited to stone tools, modified bone, antler, ivory, or wood material, campfire rings, stone cairns, cabins and other structures and their ruins, mining equipment, refuse dumps, etc. In accordance with the Paleontological Resources Protection Act (16 U.S.C. 470aaa), the disturbance, excavation and collection of vertebrate fossils (the bones of prehistoric animals) is also prohibited.

25. Disposal of human waste within 200 feet of water bodies is prohibited.

26. When digging cat holes or pit toilets, the surface vegetation or organic mat will be retained and replaced once the hole is filled to encourage rapid natural recovery.

27. Toilet paper and all hygiene products (including feminine products and diapers) must be packed out.

28. Attracting wildlife to food and garbage is prohibited.

29. Burial of garbage is prohibited.

30. Use of pesticides without the specific authority of the AO is prohibited.

31. Chasing wildlife with ground vehicles is prohibited.

32. The cumulative number of authorized visits (defined as each day in which work is done within 500 meters of a nest site) to any known or discovered raptor nesting site per nesting season (April 15 through August 15) by all authorized users shall be limited to three.

33. To reduce disturbance from campsite activity to nesting falcons, campsites authorized by the BLM, including short- and long-term camps and agency work camps, shall be located at least 1,640 feet from any known falcon nest site. Exceptions may be granted by the AO through the normal permitting process.

34. All authorized users shall submit for approval an operational plan that includes dates, locations, and schedule of visits to areas with known raptor nest sites, when dates are between April 15 and August 1 if not included in application. Authorized users shall follow the guidelines for conducting activities near raptor nests.

35. Off-road foot or vehicle traffic, construction, and nonemergency hazardous material or solid waste cleanup shall be prohibited within 1 mile of known arctic peregrine and gyrfalcon nests from April 15 through August 1. Nonemergency cleanup refers to remediation of old sites, such as removal of drums or soil that have been contaminated for longer than 1 year.

36. The authorized user shall protect all survey monuments and be responsible for survey costs if re-monumentation is required as a result of the user's actions. Survey monuments include, but are not limited to, General Land Office and Bureau of Land Management Cadastral Survey Corners, reference corners, witness points, U.S. Coast and Geodetic benchmarks and triangulation stations, military control monuments, and recognizable civil (both public and private) survey monuments.

37. In the event of obliteration or disturbance of any of the survey monuments above, the Authorized user shall promptly report the incident, in writing, to the Authorized Officer and the respective installing agency, if known. Where General Land Office or Bureau of Land Management (BLM) right-of-way monuments or references are obliterated during operations, the Authorized user shall secure the services of a registered land surveyor or a BLM Cadastral surveyor to restore the disturbed monuments and references using surveying procedures found in the BLM Manual of Surveying Instructions for the Survey of Public Lands of the United States, latest edition, and file an appropriate public record of the corner rehabilitation. If the BLM cadastral surveyors or other Federal surveyors are used to restore the disturbed survey monuments, the Authorized user shall be responsible for survey costs.

38. The authorized user is responsible for costs and coordination related to invasive species management to ensure that activities of the authorized user do not result in the introduction, establishment, or spread of Priority Invasive Species (PIP) for applicable periods of the permit.

39. In lieu of an initial inspection conducted by the applicant, the BLM may use best available data by consulting the Alaska Exotic Plants Information Clearinghouse (AKEPIC) and notify an applicant of known PIP occurrences to establish a baseline of any pre-activity infestations within the project area.

40. Authorized user shall develop project-specific preventative measures based upon standard best management practices for preventing the introduction and spread of invasive species. Preventative measures shall include but may not be limited to the following:

    a. Authorized user shall ensure that all equipment, vehicles (e.g., trucks, trailers, watercraft, aircraft), and gear is free of visible soil, seeds, and vegetative parts before deploying to the project site and before moving from areas of known PIP infestations.

    b. Authorized user shall not park or stage equipment, supplies, or materials in areas known to be infested with PIP. When feasible, activities shall commence from known un-infested areas and progress toward known infested areas.

41. If treatment is necessary to eradicate infestations that result from the permitted activities (i.e. documented establishment or spread of PIP above the baseline of pre-activity infestations), authorized user-proposed treatment methods must receive concurrence from the AO. If the authorized user fails to perform the necessary treatment, the BLM may initiate treatment at the expense of the authorized user. The authorized user shall reimburse BLM for the cost of the treatment. The BLM will proportionally apply any cost incurred among all authorized users of the site.

42. If treatment is necessary to eradicate infestations that result from the permitted activities (i.e. documented establishment or spread of PIP above the baseline of pre-activity infestations), authorized user-proposed treatment methods must receive concurrence from the AO. If the authorized user fails to perform the necessary treatment, the BLM may initiate treatment at the expense of the authorized user. The authorized user shall reimburse BLM for the cost of the treatment. The BLM will proportionally apply any cost incurred among all authorized users of the site.

43. If PIP are incidentally observed, report species, location and size of infestation (number of plants/area of infestation) to the AO for reporting to AKEPIC.

44. If a spectacled or Steller's eider is flushed from the ground or a nest found while conducting Activities, the nest must be avoided in future visits to the area and visits to the nest are prohibited.

45. All personnel working in the area would be required to have both Polar Bear Awareness training and Wildlife Interaction and Avoidance training.

46. To minimize effects to polar bears, aircraft would divert their flight paths to a minimum of 1,500 feet above ground level or a one-half mile horizontal distance from any observed bear(s) whenever possible.

47. Helicopter flight routes would be flown at least one mile from marine waters over terrestrial habitat and aircraft would approach sites, when practical, from a terrestrial aspect rather than from over marine water to minimize any potential disturbance to marine mammals, including polar bears and seals, that may be using the nearshore

**Exhibit 5 - Page 7 of 23**

marine habitat. Further, a 360-degree visual survey of area along the coast would be required before landing. If any marine mammals (including polar bear) are observed within 0.25 mile, the helicopter would not land and would immediately leave the area.

48. Helicopter crews would not takeoff or land if a polar bear is within 0.50 mile of the takeoff/landing site and crews would be trained to observe for polar bears, in addition to having a bear guard.

# 2008 Northeast NPR-A ROD Lease Stipulations

### *D-1 Lease Stipulation*

<u>Objectives</u>: Protect fish-bearing rivers, streams, and lakes from blowouts and minimize alteration of riparian habitat.

<u>Requirement/Standard</u>: Exploratory drilling is prohibited in rivers and streams, as determined by the active floodplain, and fish-bearing lakes.

### *D-2 Lease Stipulation*

<u>Objective</u>: Minimize surface impacts from exploratory drilling.

<u>Requirement/Standard</u>: Construction of permanent or gravel oil and gas facilities shall be prohibited for exploratory drilling. Use of a previously constructed road or pad may be permitted if it is environmentally preferred.

### *G-1 Lease Stipulation*

<u>Objective</u>: Ensure the final disposition of the land meets the current and future needs of the public.

<u>Requirement/Standard</u>: Upon abandonment or expiration of the lease, all oil- and gas-related facilities shall be removed and sites rehabilitated to as near the original condition as practicable, subject to the review of the AO. The AO may determine that it is in the best interest of the public to retain some or all facilities. Within the Goose Molting Area, the AO, when determining if it is in the best interest of the public to retain a facility, will consider the impacts of retention to molting geese and goose molting habitat.

# 2013 NPR-A ROD Lease Stipulations

*D-1 Lease Stipulation*
<u>Objectives</u>: Protect fish-bearing rivers, streams, and lakes from blowouts and minimize alteration of riparian habitat.
<u>Requirement/Standard:</u> Exploratory drilling is prohibited in rivers and streams, as determined by the active floodplain, and fish-bearing lakes.

*D-2 Lease Stipulation*
<u>Objective</u>: Minimize surface impacts from exploratory drilling.
<u>Requirement/Standard</u>: Construction of permanent or gravel oil and gas facilities shall be prohibited for exploratory drilling. Use of a previously constructed road or pad may be permitted if it is environmentally preferred.

*E-2 Lease Stipulation*
<u>Objective</u>: Protect fish-bearing water bodies, water quality, and aquatic habitats.
<u>Requirement/Standard:</u> Permanent oil and gas facilities, including roads, airstrips, and pipelines, are prohibited upon or within 500 feet as measured from the ordinary high water mark of fish-bearing waterbodies. Essential pipeline and road crossings will be permitted on a case-by-case basis. Note: Also refer to Stipulations/Best Management Practices K-1 and K-2. Construction camps are prohibited on frozen lakes and river ice. Siting of construction camps on river sand and gravel bars is allowed and encouraged. Where leveling of trailers or modules is required and the surface has a vegetative mat, leveling shall be accomplished through blocking rather than use of a bulldozer.

*E-3 Lease Stipulation*
<u>Objective</u>: Maintain free passage of marine and anadromous fish and protect subsistence use and access to subsistence hunting and fishing.
<u>Requirement/Standard</u>: Causeways and docks are prohibited in river mouths or deltas. Artificial gravel islands and bottom-founded structures are prohibited in river mouths or active stream channels on river deltas. Causeways, docks, artificial islands, and bottom-founded drilling structures shall be designed to ensure free passage of marine and anadromous fish and to prevent significant changes to nearshore oceanographic circulation patterns and water quality characteristics. A monitoring program, developed in consultation with appropriate federal, State, and North Slope Borough regulatory and resource agencies, shall be required to address the objectives of water quality and free passage of fish.

*G-1 Lease Stipulation*
<u>Objective</u>: Ensure long-term reclamation of land to its previous condition and use.
<u>Requirement/Standard:</u> Prior to final abandonment, land used for oil and gas infrastructure—including but not limited to well pads, production facilities, access roads, and airstrips—shall be reclaimed to ensure eventual restoration of ecosystem function. The leaseholder shall develop and implement an abandonment and reclamation plan approved by the BLM. The plan shall describe short-term stability, visual, hydrological, and productivity objectives and steps to be taken to ensure eventual ecosystem restoration to the land's previous hydrological, vegetative, and habitat condition. The BLM may grant exceptions to satisfy stated environmental or public purposes.

# 2025 NPR-A ROD Required Operating Procedures

The following is a subset of the 2025 National Petroleum Reserve-Alaska Integrated Activity Plan Record of Decision requirements. Applicable Stipulations and Required Operating Procedures are incorporated and would be required to be followed. The numbering refers to the original numbering in the 2025 National Petroleum Reserve in Alaska Integrated Activity Plan (IAP) Record of Decision (ROD). The stipulations and required operating procedures not applicable to this project have been deleted. The original numbering, however, has been retained so the authorized user can refer back to the 2025 IAP ROD.

## ROP A-1 – Waste and Litter

<u>Objective</u>: Protect public health, safety, and the environment by disposing of solid waste and garbage in accordance with applicable federal, State, and local laws and regulations.

<u>Requirement/Standard</u>: Areas of operation shall be left clean of all debris. All solid waste and industry-derived trash originating from permitted activities are required to be properly containerized while on-site or removed from the area of operation and activity.

## ROP A-2 – Waste Management Plan

<u>Objective</u>: Minimize potential impacts on the environment from nonhazardous and hazardous waste generation. Encourage continuous environmental improvement. Protect the health and safety of oil field workers, local communities, subsistence users, recreationists, and the general public. Avoid human-caused changes in predator populations. Minimize attraction of predators, particularly bears, to human use areas.

<u>Requirement/Standard</u>: Permittees shall prepare and implement a comprehensive waste management plan; the AO may waive this requirement for minimally impactful activities. The plan shall be submitted to the AO for approval as part of a plan of operations or other similar permit application.

Management decisions affecting waste generation would be addressed in the following order of priority: 1) prevention and reduction, 2) recycling, 3) treatment, and 4) disposal. The plan would consider and take into account the following requirements:

   a. <u>Disposal of food or other organic waste</u>. Permittees shall have a written procedure to ensure that the handling and disposal of food or other organic waste will be accomplished in a manner that prevents the attraction of wildlife. All food or other organic waste shall be incinerated, backhauled, or composted.
   b. All solid waste, including incinerator ash, shall be disposed of in an approved waste-disposal facility, in accordance with U.S Environmental Protection Agency (EPA) and Alaska Department of Environmental Conservation (ADEC) regulations and procedures.
   c. The burial of human waste is prohibited, except as authorized by the AO.
   d. Use bear-resistant containers for all waste materials and classes that are bear attractants. The plan will include a list of all classes of waste material that are bear attractants and thus must be stored in bear-resistant containers.

<u>Disposal of pumpable waste products</u>. Except as specifically provided, the BLM requires that all pumpable solid, liquid, and sludge waste be disposed of by injection, in accordance with EPA, ADEC, and the Alaska Oil and Gas Conservation Commission regulations and procedures. On-pad temporary muds and cuttings storage, as approved by ADEC, will be allowed as necessary to facilitate annular injection and/or backhaul operations.

## ROP A-3 – Hazardous Substances Contingency Plans

Objective: Minimize potential pollution through effective hazardous substances contingency planning.

Requirement/Standard: For oil and gas-related activities, a hazardous substances contingency plan shall be prepared and implemented before transportation, storage, or use of hazardous substances. The plan shall include the following:

a. Identification of the hazardous substances
b. Procedures for proper storage and handling of the hazardous substances
c. Procedures for prompt response, notification, and cleanup in the event of a release

If the elements of this plan are included in documents prepared to meet other federal, State, or local requirements, the AO may approve referencing the appropriate documents instead of preparing a hazardous substances contingency plan.

*ROP A-4 – Spill Prevention*

Objective: Minimize potential impacts of contaminants on fish, wildlife, and the environment, including wetlands, marshes, and marine waters, as a result of fuel spills. Protect subsistence resources and subsistence activities. Protect public health and safety.

Requirement/Standard: Permittees with oil storage capacity of 1,320 gallons or greater shall prepare a spill prevention, control, and countermeasure plan as required by 40 Code of Federal Regulations (CFR) 112. Additionally, all permittees shall be required to do the following:

a. Notice of any spill shall be given to the AO as soon as possible but no later than 24 hours after occurrence. Other federal, State, and NSB entities shall be notified as required by law.
b. All spills shall be cleaned up immediately and to the satisfaction of the AO and all agencies with regulatory authority over spills.
c. Sufficient oil spill cleanup materials (sorbent pads, containment devices, etc.) shall be stored at all fueling points and maintenance areas. Drip basins and/or sorbent pads would be placed under all nondry disconnect type fuel line couplings and valves during fueling.
d. All fuel and oil or petroleum product containers, including barrels and propane tanks, shall be marked with the permittee's name and the product type. Duck ponds shall be marked with the permittee's name.
e. Fuel containers and hazardous materials containers of any size shall be stored in secondary containment.

*ROP A-5 – Refueling and Fuel Storage*

Objective: Minimize the impact of contaminants from refueling operations on fish, wildlife and the environment.

Requirement/Standard: Fuel storage and refueling of equipment within 100 feet of any lake shoreline or top of streambank is prohibited. Small fuel caches (up to 210 gallons) are permitted within this distance. The AO may allow larger fuel caches or refueling operations within the 100 foot setback if properly designed to account for local site conditions.

*ROP A-6 – Minimize Wildlife Interaction*

Objective: Minimize conflicts between humans and wildlife and avoid human-caused increases in predator populations.

Requirement/Standard: Permittees shall minimize conflicts between wildlife and humans.

a. Permittee shall develop a site-specific wildlife interaction plan that would include, but is not limited to:
   i. Strategies to minimize attraction of wildlife to activity sites.

**Exhibit 5 - Page 11 of 23**

    ii.    Organizing layout of buildings and work sites to minimize human/wildlife interactions.

    iii.    Warning personnel of bears near or on work sites and identifying proper procedures to be followed.

    iv.    Establishing procedures, if authorized, to discourage wildlife from approaching the work site.

    v.    Providing contingencies in the event bears do not leave the site or cannot be discouraged by authorized personnel.

    vi.    Establishing proper storage and disposal of materials that may be toxic or attractants to wildlife.

b.    Provide, annually, a systematic record of all species of bears on and near the project area.

c.    Incorporate into infrastructure design measures to deter ravens, raptors, and foxes from nesting, denning, or seeking shelter. The permittee shall provide the AO with an annual report on any instances when, despite use of such measures, the use of infrastructure by ravens, raptors, and foxes did occur.

d.    Feeding wildlife is prohibited.

e.    Prevent the emission of odors by installing kitchen hood exhaust filtration systems such as cleaners, filters, purifiers, and scrubbers.

## ROP B-1 – Water Use from Rivers and Stream

Objective: Maintain populations of, and adequate habitat for, fish and invertebrates.

Requirement/Standard: Withdrawal of unfrozen water from rivers and streams during winter is prohibited. The removal of ice aggregate from grounded areas ≤4 feet deep may be authorized from rivers on a site-specific basis.

## ROP B-2 – Water Use from Lakes

Objective: Maintain natural hydrologic regimes in soils surrounding lakes and ponds and maintain populations of, and adequate habitat for, fish, aquatic invertebrates, and birds.

Requirement/Standard: Withdrawal of unfrozen water from lakes and the removal of ice aggregate from grounded areas 4 feet deep or less during winter and withdrawal of water from lakes during the summer may be authorized on a site-specific basis, depending on water volume and depth, the fish community, and connectivity to other lakes or streams.

Winter Water Use

a.    Lakes with sensitive fish (i.e., any fish except ninespine stickleback or Alaska blackfish): Unfrozen water available for withdrawal is limited to 15 percent of calculated volume deeper than 7 feet.

b.    Lakes with only nonsensitive fish (i.e., ninespine stickleback or Alaska blackfish): Unfrozen water available for withdrawal is limited to 30 percent of calculated volume deeper than 5 feet.

c.    Lakes with no fish, regardless of depth: Unfrozen water available for withdrawal is limited to 20 percent of total lake volume.

d.    Ice aggregate may be removed from grounded areas 4 feet deep or less on any lake. The combination of unfrozen water and ice aggregate must not exceed 20 percent of total lake volume at lakes with resistant fish species only and lakes with no fish. The combination of unfrozen water and ice aggregate must not exceed 20 percent of total lake volume at lakes with sensitive fish species.

**Exhibit 5 - Page 12 of 23**

e.     Compacting snow cover or removing snow from ungrounded ice areas of fish-bearing waterbodies would be prohibited, except at approved ice road and snow trail stream crossings, water pumping stations on lakes, and ice airstrips on lakes. Additional data collection may be required at ice airstrips.

Summer Water Use

f.     Requests for summer water use must be made separately, and the volume allowance would be evaluated through the normal permitting process. Approval from the BLM AO is required.

All Water Use

g.     Any water intake structures in fish-bearing or non-fish-bearing waters shall be designed, operated, and maintained to prevent fish entrapment, entrainment, or injury. All water withdrawal equipment must be equipped with and use fish screening devices approved by the Alaska Department of Fish and Game (ADF&G) Habitat Section.

h.     Additional modeling or monitoring may be required to assess lake water level, outlet flow, and/or water quality conditions before, during, and after water use from any lake of special concern.

i.     A daily record of water removed as unfrozen water or ice aggregate (separately) must be maintained and submitted to the BLM with the weekly report of activities. Submitting water and ice use in the format specified by the BLM is required.

j.     The BLM must be notified within 48 hours if water removal exceeds the volume approved at any lake.

The BLM must be notified within 48 hours of any observation of dead or injured fish on water source intake screens, in the hole being used for pumping, or within any portion of ice roads or pads. If observed at a particular lake, pumping must cease temporarily from that hole until additional preventive measures are taken to avoid further impacts on fish.

*ROP C-1 – Den Buffers and Survey Requirements*

Objective: Protect grizzly bear, polar bear, and marine mammal sea ice breathing holes, lairs, and birthing locations.

Requirement/Standard:

a.     Grizzly bear dens—Cross-country use of all vehicles, equipment, and oil and gas activity is prohibited within 0.5 miles of occupied grizzly bear dens identified by the ADF&G or the U.S. Fish and Wildlife Service (USFWS), unless alternative protective measures are approved by the BLM AO, in consultation with the ADF&G.

b.     Polar bear dens—Cross-country use of vehicles, equipment, oil and gas activity, and seismic survey activity is prohibited within 1 mile of known or observed polar bear dens, unless alternative protective measures are approved by the BLM AO and are consistent with the Marine Mammal Protection Act and the Endangered Species Act (ESA).

c.     In order to limit disturbance around known polar bear dens, implement the following:

    a.     Attempt to locate polar bear dens—Permittees seeking to carry out onshore activities in known or suspected polar bear denning habitat during the denning season (approximately November to April) must make efforts to locate occupied polar bear dens within and near areas of operation, utilizing den detection techniques approved in consultation with the USFWS. All observed or suspected polar bear dens must be reported to the USFWS prior to the initiation of activities.

    b.     Observe the exclusion zone around known polar bear dens—Permittees must observe a 1-mile operational exclusion zone around all known polar bear dens during the denning season (approximately November–April, or until the female

and cubs leave the areas). Should previously unknown occupied dens be discovered within 1 mile of activities, work must cease and the USFWS must be contacted for guidance. The USFWS will evaluate these instances to recommend the appropriate action. Potential actions may range from cessation or modification of work to conducting additional monitoring, and the holder of the authorization must comply with any additional measures specified.

    c. Use the den habitat map developed by the U.S. Geological Survey—This measure ensures that the location of potential polar bear dens is considered when conducting activities in the coastal areas of the Beaufort Sea.

    d. Polar bear den restrictions—Restrict the timing of the activity to limit disturbance around dens.

d. In order to limit disturbance of activities to seal lairs in the nearshore area (< 9.8-foot water depth):

    a. Specific to seismic operations:

        a. Prior to the initiation of winter seismic surveys on marine ice, the permittee will conduct a sound source verification test approved by the BLM and National Marine Fisheries Service (NMFS). The test is to measure the attenuation distance to the 120 decibels re 1 micro Pascal of project-associated sound levels through grounded ice to areas potentially occupied by ice seals (ungrounded ice and open water). The permittee will share the results with the BLM and the NMFS. The attenuation distance will be used to buffer all marine on-ice seismic survey activity operations to areas potentially occupied by ice seals.

    b. For all activities:

        a. Maintain airborne sound levels of equipment below 100 decibels re 20 micro Pascals at 66 feet. If equipment will be used that differs from what was originally proposed, the permittee must inform the BLM AO and share sound levels and air and water attenuation information for the new equipment.

        b. On-ice operations after May 1 will employ a full-time, trained, protected species observer on vehicles to ensure that all basking seals are avoided by vehicles by at least 500 feet and will ensure that all equipment with airborne noise levels above 100 decibels re 20 micro Pascals are operating at distances from observed seals that allow for the attenuation of noise to levels below 100 decibels. All sightings of seals will be reported to the BLM using a NMFS-approved observation form.

        c. Sea ice trails must not be greater than 12 feet wide. No driving will be allowed beyond the shoulder of the ice trail or off planned routes unless necessary to avoid ungrounded ice or for other human or marine mammal safety reasons. On-ice driving routes shall minimize travel over snow/ice/topographical features that could foster the development of birthing lairs.

        d. No unnecessary equipment or operations (e.g., camps) will be placed or used on sea ice.

*ROP C-2 – Winter Tundra Travel*

<u>Objective</u>: Protect stream banks, minimize compaction of soils, and minimize the breakage, abrasion, compaction, or displacement of vegetation.

Requirement/Standard:

    a.    Off-road travel will be allowed by the BLM AO when soils are frozen to sufficient depth (defined by a soil temperature of 23 degrees Fahrenheit or lower at a depth of 12 inches), and 6 inches of snow cover exists. Snow distribution and pre-packing may be used to maintain sufficient snow cover in areas of poor snow coverage. The permittee shall submit data to the BLM to show that these conditions have been reached prior to conducting work.

    b.    Snow survey and soil freeze-down data collected for ice road or snow trail planning and monitoring shall be submitted to the BLM with the required weekly report of operations.

    c.    Off-road travel is generally to be conducted with low-ground-pressure vehicles unless otherwise approved by the BLM AO. Low-ground pressure is defined as vehicles with less than 4 psi ground pressure, or vehicles that have passed the Alaska Department of Natural Resources low-pressure vehicle qualification certification.

    d.    All vehicles shall be selected and operated in a manner that eliminates direct impacts on the tundra by shearing, scraping, or excessive compaction. *Note: This provision does not include the use of heavy equipment required during ice road construction; however, heavy equipment would not be allowed on the tundra until conditions in a., above, are met.*

    e.    Bulldozing tundra mat and vegetation for the construction of trails or seismic lines is prohibited. Clearing or smoothing drifted snow is allowed to the extent that the tundra mat is not disturbed. Only smooth pipe snow drags would be allowed for smoothing drifted snow.

    f.    Ice roads would be designed and located to avoid the most sensitive and easily damaged tundra types, as much as practicable.

    g.    Motorized ground vehicle use associated with overland moves, seismic work, and any similar use of heavy equipment shall be minimized within an area that extends 1 mile west or northwest of the bluffs of the Colville River and 2 miles on either side of the Kogosukruk and Kikiakrorak Rivers and tributaries of the Kogosukruk River from April 15 through August 5, with the exception that use shall be minimized in the vicinity of gyrfalcon nests beginning March 15. Such use would remain 0.5 miles from known raptor nesting sites, unless authorized by the AO.

    h.    Incidents of damage to the tundra shall be reported to the AO within 72 hours of occurrence. Follow-up corrective actions shall be determined in consultation with and approved by the AO.

    i.    The permittee shall provide the BLM with an as-built of all ice roads, snow trails, and ice pads after the infrastructure is completed. Data must be in a Geographic Information System (GIS) format (ESRI shapefiles referencing the North American Datum of 1983).

*ROP C-3 – Ice Bridges*

Objective: Maintain natural spring runoff patterns and fish passage, avoid flooding, prevent streambed sedimentation and scour, protect water quality, and protect stream banks.

Requirement/Standard: Crossing of waterway courses shall be made using a low-angle approach. Crossings that are reinforced with additional snow or ice ("bridges") shall be removed, breached, or slotted before spring breakup. Ramps shall be removed to the extent possible without damaging stream banks. Ramps and bridges shall be substantially free of soil and debris.

The permittee shall provide to the BLM any ice thickness and water depth data collected at ice road or snow trail stream crossings during the pioneering stage of road and trail construction. At the end of operations in the spring, the permittee shall provide the BLM with photographs of all stream crossings that have been removed, breached, or slotted.

*ROP C-4 – Winter Travel Along Streambeds*
Objective: Avoid additional freeze-down of deep-water pools harboring over-wintering.
Requirement/Standard: Some travel up and down streambeds would be allowed by the individual vehicles collecting snow from river drifts or ice aggregate from the channel (where ice is grounded). Use of the frozen streambed as the primary ice road or snow trail route is prohibited. Rivers and streams shall be crossed at areas of grounded ice, whenever possible.

*ROP C-5 – Seismic Surveys Near Fish Habitat*
Objective: Minimize the effects of high-intensity acoustic energy from seismic surveys on fish.
Requirement/Standard:
   a. When conducting vibroseis-based surveys above potential fish overwintering areas (water 6 feet deep or greater ice plus liquid depth), permittees shall follow recommendations by Morris and Winters (2005); that is, only a single set of vibroseis shots should be conducted if possible. If multiple shot locations are required, these should be conducted with minimal delay; multiple days of vibroseis activity above the same overwintering area should be avoided, if possible.
   b. When conducting air gun-based surveys in freshwater, permittees shall follow standard marine mitigation measures that are applicable to fish (e.g., MMS 2008[1]); that is, permittees shall use the lowest sound levels feasible to accomplish their data-collection needs; ramp-up techniques will be utilized (ramp-up involves the gradual increase in emitted sound levels, beginning with firing a single air gun and gradually adding air guns until the desired operating level of the full array is obtained).
   c. When conducting explosive-based surveys, permittees shall follow setback distances from fish bearing waterbodies, based on requirements outlined by Timothy (2013[2]).

*ROP D-1 – Oil and Gas Exploratory Drilling*
Objective: Minimize surface impacts from exploratory drilling.
Requirement/Standard: Construction of permanent oil and gas facilities shall be prohibited for exploratory drilling. Use and minor modification of a previously constructed road or pad may be permitted.

*ROP E-1 – Protections for Subsistence Users*
Objective: Protect subsistence use and access to subsistence hunting and fishing areas, and minimize potential impacts of development on subsistence resources.
Requirement/Standard: All roads must be designed, constructed, maintained, and operated to minimize environmental impacts and to allow for subsistence use and access to subsistence use areas.

---

[1] Minerals Management Service. 2008. Alaska Outer Continental Shelf, Beaufort Sea and Chukchi Sea Planning Areas, Oil and Gas Lease Sales 209, 212, 217, 221. Draft Environmental Impact Statement OCS EIS/EA MMS 2008-0055. U.S. Department of the Interior, Minerals Management Service, Alaska OCS Region.
[2] Timothy, J. 2013. Alaska Blasting Standard for the Proper Protection of Fish. Alaska Department of Fish and Game, Technical Report No. 13-03, Douglas.

a. Subsistence pullout and access/egress ramps shall be incorporated into future project design and construction in adequate numbers and at appropriate locations on all roads to facilitate access to subsistence use areas. Prior to constructing a road, permittees shall gather input from communities (tribe, village ANCSA corporation, and city) regarding the number and location of pullouts and associated access ramps. Permittees shall post the locations of the ramps publicly and provide a mechanism for local community members to comment on the location of the ramps. The AO may require "hardening" of the tundra around the bottom of the ramps to prevent damage from summer use.

b. Permittees shall construct subsistence pullouts and boat ramps at crossings of important subsistence rivers and streams as determined by consultation with the affected community. The AO may waive this requirement where boat access is not possible at the crossing or if consultation with the affected community determines that a boat ramp is not useful at that location.

c. Permittees must allow subsistence use of permanent gravel roads and appropriate ice roads, consistent with safe operations. Permittees shall provide communities and the BLM with concise policies regarding use of all roads and hunting prohibitions, if any, along the roads and near facilities. Permittees shall ensure that any road use guidelines and updated road maps are disseminated throughout the communities, including making them available online and through social media. Permittees shall include a presentation on road use policies in employee orientations, shall ensure that subcontractors have the policy for their employee orientation, and shall maintain copies of the policies at security stations and safety checkpoints.

d. Before ice road construction begins, the permittee shall post copies of maps of that winter's ice roads and make them readily available online. The permittee shall also offer to the nearest affected community(s) a meeting to discuss routes; the permittee shall notify the BLM at least 1 week prior to any such meeting.

*ROP E-9 – Protections for Certain Bird Species with Special Status*

Objective: Minimize impacts on bird species, particularly those listed under the ESA and BLM special status species, resulting from direct or indirect interaction with infrastructure.

Requirement/Standard: Bird species with special status are protected under ROP E-8 and ROP E-15, and by the protections outlined below. In accordance with the guidance below, before the approval of infrastructure construction, the following studies shall be conducted, and recommended design elements shall be incorporated.

*Special Conditions in Spectacled and/or Steller's Eiders Habitats*

a. The BLM will require submittal of a minimum of 3 years of site-relevant survey data before authorization of construction, if such construction is within spectacled and Steller's eider habitats, as defined by the area contained within the USFWS Arctic Coastal Plain Aerial Waterbird Breeding Population Survey area or the Barrow Triangle Steller's Eider Survey area. The BLM will evaluate adequacy of survey data and ecological mapping (as required under ROP E-10) to determine if ground-based nest surveys are required. If required, spectacled and/or Steller's eider ground nest surveys shall be conducted, following accepted BLM protocol. Information gained from these surveys shall be used to make infrastructure siting decisions, as discussed in subparagraph "b," below. Data shall be transmitted to the BLM in a GIS format (ESRI shapefiles referencing the North American Datum of 1983).

b.    If spectacled and/or Steller's eiders are determined to be present within the proposed development area, the applicant shall work with the USFWS and the BLM early in the design process to site roads and infrastructure in order to minimize impacts on nesting and brood-rearing eiders and their habitats. Such consultation shall address timing restrictions and other temporary mitigating measures, location of permanent infrastructure, placement of fill, alteration of eider habitat, aircraft operations, and management of noise levels.

*ROP E-8 – Facility Visibility Requirements*
Objective: Minimize bird collisions with infrastructure, especially during migration and inclement weather.
Requirement/Standard: Flagging of structures, such as elevated utility lines and guy wires, shall be required to minimize bird collision. All facility external lighting, during all months of the year, shall be designed to direct artificial exterior lighting inward and downward or be fitted with shields to reduce reflectivity in clouds and fog conditions, unless otherwise required by the Federal Aviation Administration.

*ROP E-11 – Protections for Cultural Resources*
Objective: Protect cultural and paleontological resources.
Requirement/Standard: Permittees shall conduct a cultural and paleontological resources survey prior to any ground-disturbing activity. Primary investigators overseeing cultural surveys must meet the Secretary of the Interior's professional qualification standards for qualified professional archaeologists (36 CFR 61, Appendix D). Upon discovering a potentially undocumented cultural or paleontological resource, the permittee or their designated representative shall notify the AO and suspend all operations in the immediate area of the discovery until the AO issues a written authorization to proceed. Permittees shall avoid any identified cultural and paleontological sites by a minimum of 500 feet from the site boundary.

*ROP F-1 – Aircraft Use Plan*
Objective: Provide aviation data required for BLM management, for ESA consultation with the USFWS and NMFS, and to minimize impacts on subsistence activities and wildlife.
Requirement/Standard: Permittees shall submit an aircraft use plan at least 60 days prior to permitted activities. The plan shall include the following elements:
a.    The estimated number of anticipated flights, as defined by a single takeoff and landing, including the estimated number that will occur north of 70 degrees North latitude (to allow for programmatic ESA consultation). The number of takeoffs and landings should be limited to the maximum extent practicable. During the design of proposed infrastructure projects, larger landing strips and storage areas should be considered to allow the use of larger aircraft.
b.    Types of aircraft, including tail numbers of aircraft (as early as possible and prior to use), and description of any unmanned aircraft use
c.    Strategies to coordinate daily aircraft use with the aviation community and local subsistence users
Methods of monitoring and reporting flights. The AO may require adjustments to the aircraft use plan, based on the results of the monitoring.

*ROP F-2 – Minimum Flight Altitudes*

<u>Objective</u>: Minimize the effects of low-flying aircraft on wildlife, subsistence activities, and local communities.

<u>Requirement/Standard</u>: Except for takeoffs and landings, manned aircraft flights for permitted activities (fixed-wing and helicopters, unless specified) shall maintain a 1,500-foot minimum altitude agl unless doing so would endanger human health and safety or violate safe flying practices, or if the purpose of the flight requires constant sight of the ground, such as sighting of wildlife or for archaeological or engineering survey flights or ice road planning and cleanup.

Exceptions to the 1,500-foot agl minimum altitude are listed below:

    a.    Single-engine manned aircraft and unmanned aircraft systems devices should not knowingly fly within 0.5 miles of walrus haul-outs; or, if required, then maintain 2,000 feet agl when within 0.5 miles of walrus haul-outs.

    b.    Helicopters and multi-engine aircraft should not knowingly fly within 1 mile of walrus haul-outs; or, if required, then maintain 3,000 feet agl and a 1-mile buffer from walrus haul-outs.

    c.    Aircraft—3,000 feet agl when within 1 mile of aggregation of marine mammals listed under the Endangered Species Act as threatened or endangered.

The BLM will provide maps and data of the areas listed above.

*ROP F-3 – Reduce Impacts of Air Traffic on Subsistence Resources*

<u>Objective</u>: To reduce the impacts of aircraft traffic on North Slope subsistence hunters.

<u>Requirement/Standard</u>:

    a.    Hazing of wildlife by aircraft is prohibited. Pursuit of running wildlife is hazing. If wildlife begins to run as an aircraft approaches, the aircraft is too close and must break away.

    b.    Minimize (consistent with operational efficiency and safety) helicopter flights during peak caribou hunting within 2 miles of important subsistence rivers.* Pay particular attention to limiting helicopter traffic during this time to flight corridors that minimize impact (e.g., perpendicular crossings upstream of cabins). The current peak dates are July 15 through August 15, but these dates may be revised from time to time in consultation with affected communities and the NSB Department of Planning and Department of Wildlife Management.

    c.    Minimize aircraft use near known subsistence camps and cabins and during sensitive subsistence hunting periods (spring goose hunting, summer and fall caribou and moose hunting) by adhering to the following guidelines:

        i.    Arrange site visits and flight schedules to conduct required activity near subsistence areas early in the season, on weekdays, and as early in the morning as possible; avoid holidays.

        ii.    Note whether activities overlap important subsistence rivers and determine if a potentially affected community's tribal or city office should be notified.

        iii.    Compare the proposed landing sites with the NSB camps and cabins map files available from the BLM Arctic District Office. If activities near camps or allotments cannot be avoided, contact the camp or allotment owner to discuss the timing of the visit.

*Important subsistence rivers are as follows. This list may be adjusted by the BLM in consultation with the affected community:

    •    Colville, Ublutuoch, Fish, and Judy Creeks (Nuiqsut)

- Utukok, Kokolik, and Kukpowruk (Point Lay)
- Kuk and tributaries (Kaolak, Ketik, Avalik, Ivisaruk, and Kungok), Kugrua (Wainwright)
- Meade, Niġisaktugvik, and Isiqtuq (Atqasuk)
- Inaru, Topagaruk, Chipp, Ikpikpuk, Miguakiak, and Piasuk (Utqiagvik)

*ROP H-1 – Subsistence Plan*

Objective: Prevent unreasonable conflicts with subsistence.

Requirement/Standard:

The permittee shall submit a subsistence plan; the AO may waive this requirement for minimally impactful activities or projects that do not impact subsistence activities of any community. The plan should be submitted as early as possible, and no later than an application submitted to the BLM. The plan will include:

a. A brief summary of the proposed activity, focusing on details relevant to subsistence, including the use of aircraft

b. In accordance with ROP H-4, a detailed description of the efforts made by the permittee to consult with directly affected subsistence communities, appropriate Native organizations, working groups, and the NSB, and how their input was considered or incorporated

c. A description of how the activity, in combination with other activities in the area, would be scheduled and located to prevent conflicts with subsistence activities

d. Procedures to facilitate access by subsistence users to the permittees' area of activity or appropriate facilities

e. A description of how the permittee would address potential subsistence issues

f. An explanation of how the activity's effects on subsistence activities would be documented and how that documentation would be made available

g. The names and contact information for subsistence representatives, project points of contact, and community liaisons. (This information should be available by the time an application is submitted to the BLM. If this information is not available when the plan is produced, the plan will include the date that it would be available and explain how the applicant would make that information available.)

h. A description of how the plan would be updated, if necessary, during the course of review and consultation

i. Information on how the permittee would keep potentially affected individuals and communities up-to-date on the progress of the activities and locations of possible, short-term conflicts with subsistence activities; such communication methods could include posting information on a website and distributing the link, social media, newsletters and radio and television announcements, community meetings, or workshops.

*ROP H-2 – Notification and Coordination with Private Property Owners*

Objective: Prevent unreasonable conflicts with subsistence access and activities by providing opportunities for coordination and incorporating input into project plans.

Requirement/Standard: Permittees shall notify Native allotment owners in writing (via email or hard copy) of any proposed project within 20 miles of a Native allotment in the NPR-A. A database of allotments and owners is maintained by the NSB or Bureau of Indian Affairs. Permittees shall offer coordination with interested allotment owners and inform the BLM of the results of that coordination. This requirement may be waived for minimally impactful activities.

Permittees conducting geophysical (seismic) exploration shall:

    a.    Notify and offer individual coordination with potentially affected allotment, camp, and cabin owners.

        i.    The official recognized list of subsistence-use cabins and campsite users is the NSB's most current inventory of cabins and campsites, which have been identified by the subsistence users' names.

        ii.    For the purpose of this standard, a potentially affected site is defined as any allotment, camp, or campsite located within the boundaries of the area proposed for geophysical exploration or within 1 mile of travel routes used to supply seismic operations.

        iii.    The AO would prohibit seismic work within 1 mile of these sites, unless an alternative agreement is reached between the site owner and the permitee.

        iv.    Provide local search and rescue organizations with proposed seismic survey locations before the operational season, and during operations, of the current location on a weekly basis; this notification should include a map indicating the current extent of surface use and occupation and areas previously used and occupied during the course of the operation; this would enable hunters to plan their hunting trips and access routes accordingly.

*ROP H-3 – Hunting, Fishing, and Trapping by Permittees*

<u>Objective</u>: Minimize potential impacts on hunting, trapping, and fishing species and on subsistence harvest of those animals consistent with requirements of the Alaska National Interest Lands Conservation Act.

<u>Requirement/Standard</u>: Hunting, trapping, and fishing by the permittee's employees, agents, and contractors is prohibited when persons are on "work status." Work status is defined as the period during which an individual is under the control and supervision of an employer. Work status is terminated when the individual's shift ends and he/she returns to a public airport or community (e.g., Fairbanks, Utqiagvik, Nuiqsut, or Deadhorse). Use of permittee facilities, equipment, or transport for personal access or aid in hunting, trapping, and fishing is prohibited.

*ROP I-1 – Employee Orientation Program*

<u>Objective</u>: Minimize cultural and resource conflicts.

<u>Requirement/Standard:</u> All personnel involved in permitted activities shall be provided with information concerning applicable stipulations, ROPs, standards, and specific types of environmental, social, traditional, and cultural concerns that relate to the region. The permittee shall ensure that all personnel involved in permitted activities shall attend an orientation program at least once a year. Elements of the program shall be provided to the AO for review upon request.

The proposed orientation program shall include:

    a.    Sufficient detail to notify personnel of applicable stipulations and ROPs, as well as inform individuals working on the project of specific types of environmental, social, traditional, and cultural concerns that relate to the region

    b.    Address the importance of not disturbing archaeological, paleontological, and biological resources and habitats, including endangered species, fisheries, bird colonies, and marine mammals, and provide guidance on how to identify and avoid disturbance to these resources

c.      Include guidance on the preparation, production, and distribution of information cards on endangered and/or threatened species

d.      Be designed to increase sensitivity and understanding of personnel to community values, customs, and lifestyles in areas in which personnel would be operating

e.      Information concerning avoidance of conflicts with subsistence, commercial fishing activities, and pertinent mitigation

f.      Information for aircraft personnel concerning subsistence activities and areas and seasons that are particularly sensitive to disturbance by low-flying aircraft; of special concern is aircraft use near traditional subsistence cabins and campsites, flights during spring goose hunting and fall caribou and moose hunting seasons, and flights near North Slope communities.

g.      Information that individual training is transferable from one facility to another, except for elements of the training specific to a particular site

h.      On-site records of all personnel who attend the program for as long as the site is active, though not to exceed the 5 most recent years of operations. This record shall include the name and dates(s) of attendance of each attendee.

i.      A module discussing bear interaction plans to minimize conflicts between bears and humans

j.      A copy of 43 CFR 3163 regarding Non-Compliance Assessment and Penalties to on-site personnel

k.      Training designed to ensure strict compliance with local and corporate drug and alcohol policies. This training should be offered to the NSB Health Department for review and comment.

## ROP L-1 – Tundra Travel

<u>Objective</u>: Protect stream banks and water quality; minimize compaction and displacement of soils; minimize the breakage, abrasion, compaction, or displacement of vegetation; protect cultural and paleontological resources; maintain populations of and adequate habitat for birds, fish, and caribou and other terrestrial mammals; and minimize impacts to subsistence activities.

<u>Requirement/Standard</u>: Low-ground-pressure vehicles (see definition in ROP C-2) may be permitted to travel off of gravel pads and roads during times other than those identified in part "*a*" of ROP C-2. Permission for such use would be granted only after an applicant has completed the following:

a.      Described procedures for route walking ahead of tundra vehicles, including what information will be collected.

b.      Designed and/or modified the use proposal to minimize impacts based on timing to protect groundnesting birds, and considered shifting work to winter, route selection, and minimizing interactions with wildlife or subsistence activities.

c.      Submitted off-road travel as part of a vehicle use plan for AO approval, except for shorter notice and unforeseen trips; see ROP M-1.

See ROP E-11 for additional requirements to protect cultural and paleontological resources.

## ROP M-1 – Vehicle Use Plans

<u>Objective</u>: Minimize disturbance and hindrance of wildlife, or alteration of wildlife movements.

<u>Requirement/Standard</u>: Permittees will submit a vehicle use plan with their permit application for approval by the AO. The AO may waive this requirement for minimally impactful activities. Vehicle use plans will have the following elements:

a.      Following wildlife with ground vehicles is prohibited. Particular attention would be given to avoid disturbing caribou.

b.      The management plan would follow industry practices to minimize or mitigate delays to caribou movement, vehicle collisions, or displacement during calving, spring migration, fall migration, and post-insect aggregation movement.

c.      Summary of all planned off-road travel, including the number of vehicles, type, and general routes

d.      Strategies for complying with Stipulations K-6, K-7, K-8, K-11, and ROP L-1, if applicable.

e.      Monitoring will be required as part of the vehicle use plan for up to 5 years after road construction. A monitoring plan could include collection of data on vehicle counts and vehicle interactions with wildlife. The AO may require adjustments to the vehicle use plan, based on the results of the monitoring.

f.      Permittees shall provide an annual report to the AO, reporting roadkill of birds and mammals to help the BLM to determine whether preventative measures on vehicle collisions are effective.

*ROP M-2 – Invasive Species Prevention Plan*

<u>Objective</u>: Prevent the introduction, or spread, of non-native, invasive plant species in the NPR-A.

<u>Requirement/Standard</u>: Prior to operations in the NPR-A, permittee shall submit a plan for the BLM's approval detailing the methods for preventing the introduction of invasive plant and animal species. The plan shall include methods for cleaning equipment and vehicles, monitoring for weeds, and weed control. Permittee shall monitor annually along roads for nonnative, invasive species and initiate effective weed control measures upon evidence of their introduction. See ROP M-3 for require