# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

SOVEREIGN IÑUPIAT FOR A LIVING
ARCTIC, *et al.*,

                Plaintiffs,

    v.

DOUG BURGUM, in his official capacity
as Secretary of the Interior, *et al.*,

                Defendants,

    and

CONOCOPHILLIPS ALASKA INC., *et al.*,

                Intervenor-Defendants.

Case No. 3:25-cv-00356-SLG

## <u>ORDER ON MOTION FOR PRELIMINARY INJUNCTION</u>

Before the Court at Docket 6 is Plaintiffs' Motion for Preliminary Injunction.[1] The Court has since granted Plaintiffs' Motion for Expedited Consideration of Plaintiffs' Motion for Preliminary Injunction.[2] Federal Defendants responded in opposition at Docket 18.[3] Intervenor-Defendant ConocoPhillips Alaska, Inc.

---

[1] Plaintiffs are Sovereign Iñupiat for a Living Arctic, Center for Biological Diversity, and the Wilderness Society. Docket 1 at ¶¶ 6-8.

[2] Docket 16.

[3] Federal Defendants are Doug Burgum, in his official capacity as Secretary of the Department of the Interior; Bill Groffy, in his official capacity as Principal Deputy Director, exercising the authority of the Acting Director of the Bureau of Land Management; Stephanie Kuhns, in her official capacity as District Manager for the Bureau of Land Management; Kevin Pendergast, in his official capacity as Alaska State Director of the Bureau of Land Management; Wayne Svejnoha, in his official capacity as Branch Chief, Energy and Minerals for the Bureau of Land Management; the United

("ConocoPhillips") responded in opposition at Docket 20 and filed an unopposed Motion for Leave to File Excess pages at Docket 21.  Intervenor-Defendant State of Alaska ("State") responded in opposition at Docket 22.  Plaintiffs replied at Docket 26.  At Docket 36, Plaintiffs filed a Notice of Incident Relating to Plaintiffs' Pending Motion for Preliminary Junction.  ConocoPhillips responded at Docket 37.[4]  Oral argument was not requested and was not necessary to the Court's determination.

## BACKGROUND

The National Petroleum Reserve–Alaska ("NPR-A"), on Alaska's North Slope, consists of 23.6 million acres and is the nation's largest single unit of public land.[5]  Established as the Naval Petroleum Reserve in 1923, the NPR-A was renamed and its management authority was transferred to the Secretary of the Interior in 1976 by the Naval Petroleum Reserves Production Act ("NPRPA"), 42

---

States Department of the Interior; and the Bureau of Land Management.  Docket 1 at ¶¶ 12-18; Docket 24 at ¶¶ 13-19.

[4] In their notice, Plaintiffs write that on January 23, 2026, Doyon 26–a large mobile drilling rig operated by ConocoPhillips—"tipped over and crashed to the ground" and question whether the damage to the drilling rig will impact ConocoPhillips' exploration and drilling this winter.  Docket 36 at 2-3.  In response, ConocoPhillips states that "[t]he Doyon 26 incident occurred on a gravel road, outside of Special Areas, and did not involve over-the-tundra travel or any caribou-related issues."  Docket 37 at 2.  ConocoPhillips also states that it is proceeding "with its planned winter exploration program," and the "seismic survey is not affected by the Doyon 26 incident and will proceed as planned."  Docket 37 at 2-3.  Further, "ConocoPhillips is also proceeding with its planned, four-well exploration drilling program, utilizing a substitute drill rig (the "Doyon 142") in place of the Doyon 26."  Docket 37 at 3.  Considering ConocoPhillips' representations, the Court believes that Plaintiffs' motion for preliminary injunction remains ready for disposition.

[5] *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 2 of 17

U.S.C. § 6501 *et seq.*[6]  In 1980, the NPRPA was amended by an appropriations rider that directed the Secretary of the Interior to conduct "an expeditious program of competitive leasing of oil and gas in the" NPR-A.[7]

Over the years, Intervenor-Defendant ConocoPhillips has acquired and developed significant lease holdings in the northeast portion of the NPR-A.[8]  As part of its efforts to develop its lease holdings, ConocoPhillips requested approval from the Bureau of Land Management ("BLM") to conduct a 2026 Winter Exploration Program ("Winter Program").[9]  The Winter Program involves drilling four exploration wells and conducting one seismic survey at specified locations in the NPR-A, including within the Teshekpuk Lake Special Area ("TLSA").[10]

On November 26, 2025, BLM issued a final Environmental Assessment ("EA"), a Finding of No New Significant Impact ("FONNSI"), and a Decision Record approving the Winter Program.[11]  The EA includes dozens of mitigation measures as required operating procedures ("ROP"s) that were previously adopted in the

---

[6] H.R. Rep. No. 94-81, at 5-6, 8-9 (1975); Naval Petroleum Reserves Production Act, Pub. L. No. 94-258, 90 Stat. 303 (1976) (codified at 42 U.S.C. § 6503(a)).

[7] Pub. L. No. 96-514, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C. § 6506a).

[8] *See Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*Willow I*), 555 F. Supp. 3d 739 (D. Alaska 2021); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*Willow II*), 701 F. Supp. 3d 862 (D. Alaska 2023), *aff'd in part, rev'd in part, and remanded by Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976 (9th Cir. 2025).

[9] Docket 18-1 at 4.

[10] Docket 18-1 at 4-5 & fig. 1.

[11] Docket 18-1; Docket 18-2.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 3 of 17
Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 3 of 17

2022 Integrated Activity Plan ("IAP") governing operations in the NPR-A.[12]  For example, ROP C-2 as then written, required, among other things, that "[g]round operations shall be allowed only when frost and snow cover are at sufficient depths to protect the tundra."[13]

On December 11, 2025, Plaintiffs filed this lawsuit.[14]  That same day, Plaintiffs filed their motion for a preliminary injunction.[15]  Plaintiffs' Complaint and motion for a preliminary injunction challenge BLM's approval of the Winter Program in the November 2025 Decision Record.[16]  The Complaint alleges that the measures that BLM approved to mitigate impacts on vegetation, including ROP C-2, are ineffective, and therefore BLM violated the NPRPA's directive to assure adequate mitigation and maximum protection.[17]  In their motion for a preliminary injunction, Plaintiffs rely on their claim that BLM failed to adequately mitigate impacts on tundra by the Winter Program, particularly in the TLSA.[18]  Plaintiffs seek to enjoin BLM's approval of the Winter Program pending adjudication of the

---

[12] Docket 18-1 at 74-91.

[13] Docket 18-1 at 81.

[14] Docket 1.

[15] Docket 6.

[16] Docket 1 at ¶¶ 1-4.

[17] Docket 1 at ¶¶ 88-98, 145-46, 150, 157-58, 162.  Plaintiffs' motion for a preliminary injunction is not based on Count 2 of their Complaint, which challenges a different mitigation measure. Docket 1 at ¶¶ 151-62.

[18] Docket 6 at 11-12.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 4 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 4 of 17

merits of Plaintiffs' challenge to that approval.

On December 22, 2025, BLM issued a 2025 IAP, which included a revised ROP C-2.[19] ROP C-2(a), as revised, provides, among other things, that

> Off-road travel will be allowed by the BLM AO [Authorized Officer] when soils are frozen to sufficient depth (defined by a soil temperature of 23 degrees Fahrenheit or lower at a depth of 12 inches), and 6 inches of snow cover exists. Snow distribution and pre-packing may be used to maintain sufficient snow cover in areas of poor snow coverage. The permittee shall submit data to the BLM to show that these conditions have been reached prior to conducting work.[20]

ROP C-2(c), (e), and (f) require that "[o]ff-road travel is generally to be conducted with low-ground-pressure vehicles unless otherwise approved by the BLM AO"; "[b]ulldozing tundra mat and vegetation for the construction of trails or seismic lines is prohibited"; and "[i]ce roads would be designed and located to avoid the most sensitive and easily damaged tundra types, as much as practicable."[21] ROP C-2(d) requires that "[a]ll vehicles shall be selected and operated in a manner that eliminates direct impacts on the tundra by shearing, scraping, or excessive compaction."[22] While that provision "does not include the use of heavy equipment required during ice road construction," "heavy equipment would not be allowed on the tundra until" the requirements of ROP C-2(a) regarding frozen soil and snow

---

[19] Docket 18-3 at 1, 65.

[20] Docket 18-3 at 65.

[21] Docket 18-3 at 65.

[22] Docket 18-3 at 65.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 5 of 17

Case 3:25-cv-00356-SLG    Document 38    Filed 01/27/26    Page 5 of 17

depth have been met.[23]

The same day that BLM approved the 2025 IAP, the Bureau issued a revised EA to conform with the 2025 IAP and reissued its Decision Record authorizing the Winter Program.[24]  Also on the same day, BLM issued a new FONNSI.[25]

The December 2025 EA addressed how the construction and use of snow and ice roads, the seismic survey, exploration drilling and well plugging would impact vegetation.[26]  In the EA, BLM determined that nine types of coarse vegetation are present in the area of the NPR-A impacted by the Winter Program.[27] Of those nine types of vegetation, BLM determined that five had a high susceptibility to long-term disturbance (covering 18% of the planning area), two had intermediate susceptibility to long-term disturbance, and the remaining two had low susceptibility to long-term disturbance.[28]  For purposes of the EA, "'long-term disturbance' is defined as disturbance lasting more than 10 years with a 25 to 50 percent decrease in vegetation or shrub cover, 5 to 15 percent exposed organic or mineral soil, and obvious compression of mosses and standing litter in

---

[23] Docket 18-3 at 65.

[24] Docket 18-4 at 1; Docket 18-5 at 1-5; *see also* Dockets 28-1, 28-2, 28-3, 28-4, and 28-5 (December 22, 2025 right-of-way grant and permits for seismic exploration and drilling).

[25] Docket 20-19.

[26] Docket 18-4 at 54.

[27] Docket 18-4 at 55-56.

[28] Docket 18-4 at 55-59.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 6 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 6 of 17

wet graminoid and moist sedge-shrub tundra."[29]

BLM also determined that "[w]ithin this ~299,000-acre buffered project area, the 408.3-acre proposed route [for snow access roads, ice roads and spurs, ice pads, and a camp move route] would potentially impact approximately 0.14 percent of the total vegetative cover."[30]  As for mitigation of any impact to vegetation during the Winter Program, BLM noted that

> Vehicle and road design variables that could lead to vegetative damage have been considered in the project design. Vehicles to be used for the Proposed Action have been specially designed or modified for snow and ice road travel and to reduce environmental damage. This includes lowering PSI by use of appropriate tires or tracks, as well as careful monitoring of speed and turning radius. Road building specifications include minimizing sharp turns and ensuring proper snow and ice thickness and quality. Use of these practices would help reduce vegetative impacts to the extent possible.[31]

Additionally, to mitigate impacts on vegetation, BLM highlighted other measures that would be implemented, including "delaying prepacking until snow depth reaches an average of six inches, use of tundra approved vehicles for prepacking, avoiding areas with low snow cover, starting snow road construction once soil temperatures reach 23-degree Fahrenheit (or below) at a depth of 12 inches, and minimizing sharp turns."[32]  As for seismic surveying, BLM concluded that "seismic

---

[29] Docket 18-4 at 55.

[30] Docket 18-4 at 60.

[31] Docket 18-4 at 62.

[32] Docket 18-4 at 62-63.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 7 of 17

Case 3:25-cv-00356-SLG    Document 38    Filed 01/27/26    Page 7 of 17

activity would likely result in both short and long-term impacts to vegetation," and long-term impacts "could include isolated areas of an irreversible eroding thermal process (e.g., thermokarst), ground subsidence, and changes in species composition."[33] "Aesthetic impacts from linear 'scars' could also persist."[34] BLM further noted that "[t]he timeframe for full vegetation recovery could be highly variable" with one study showing "that after 25 years, none of the seismic survey trails were still disturbed, but 9 percent of the camp move trails were."[35] BLM reasoned that "[i]mpacts from seismic lines would be expected to be less compared to earlier studies as methodologies have greatly improved since the 1984-1985 seismic work" and while "[c]amp moves use equipment with similar ground pressures to that earlier exploration," "snow trail design and standards have improved."[36] BLM concluded that it "expected impacts to vegetation would be minor and would be further minimized through applicable mitigation measures."[37]

In the December 2025 FONNSI, BLM determined that "[t]he immediate impacts from the Proposed Action would be expected to be minimal to moderate

---

[33] Docket 18-4 at 64.

[34] Docket 18-4 at 64.

[35] Docket 18-4 at 64.

[36] Docket 18-4 at 64.

[37] Docket 18-4 at 64.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 8 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 8 of 17

and temporary."[38]  Regarding impacts to vegetation and soil, BLM concluded that "expected impacts to vegetation would be minor, and expected impacts to soils and permafrost would be dispersed and any impacts would be minimized through applicable mitigation measures."[39]

On December 29, 2025, Plaintiffs filed an Amended Complaint in light of the December 2025 IAP, EA, and Decision Record.[40]  The Amended Complaint recognizes that some of the implementing regulations regarding the NPR-A—including 43 C.F.R. § 2361.40(g)(3), (6)(iii)-(v) on which Plaintiffs rely in their Amended Complaint—were rescinded in the interim between the November 2025 and December 2025 approvals of the Winter Program.[41]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the [Administrative Procedure Act, 5 U.S.C. §§ 701-706,] of its own force may serve as a jurisdictional predicate."[42]

---

[38] Docket 20-19 at 1.

[39] Docket 20-19 at 3.

[40] Docket 24.

[41] Docket 24 at ¶ 32 (citing Rescission of the Management and Protection of the National Petroleum Reserve in Alaska Regulations, Issued May 7, 2024, 90 Fed. Reg. 51470 (Nov. 17, 2025); *see* Docket 18 at 6 n.3 (citing same).

[42] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 9 of 17

Case 3:25-cv-00356-SLG    Document 38    Filed 01/27/26    Page 9 of 17

## LEGAL STANDARD

In *Winter v. Natural Resources Defense Council, Inc.*, the United States Supreme Court held that plaintiffs seeking preliminary injunctive relief must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest.[43] When, as here, the government is a party to the action, the balance of equities factor and the public interest factor merge.[44] The Supreme Court in *Winter* characterized "injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[45]

Following *Winter*, the Ninth Circuit addressed the first element—the likelihood of success on the merits—and held that its "serious questions" approach to preliminary injunctions was still valid "when applied as part of the four-element *Winter* test."[46] Under that approach, if a plaintiff shows "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships

---

[43] 555 U.S. 7, 20 (2008).

[44] *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

[45] *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

[46] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 10 of 17

tips *sharply* in the plaintiff's favor.'"[47]  All four *Winter* elements must still be satisfied under this approach.[48]

Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case."[49]

## DISCUSSION

As an initial matter, the Court addresses Federal Defendants' contention that "Plaintiffs' claims have become moot because the Court 'could no longer grant effective relief as to the now non-operative' November [Decision]" because the November 2025 Decision has been superseded by the December 2025 Decision.[50] The Court agrees that Plaintiffs' claims as to the November 2025 Decision are moot as that Decision has been superseded by the December 2025 Decision.  But, in light of Plaintiffs' contention that the December 2025 Decision suffers from the same deficiencies as the November 2025 Decision and Plaintiffs' Amended Complaint,[51] the Court finds that the superseding December 2025 Decision does

---

[47] *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

[48] *See All. for the Wild Rockies*, 632 F.3d at 1135 ("Of course, plaintiffs must also satisfy the other *Winter* factors."); *see also, Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (describing standard for preliminary injunction).

[49] *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987).

[50] Docket 18 at 11 (quoting *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1131 (9th Cir. 2012)); *see also* Docket 20 at 19-20.

[51] *See* Docket 26 at 12-13.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 11 of 17

not deprive this Court of jurisdiction. The Court therefore proceeds to consider the merits of Plaintiffs' motion.

Regarding the *Winter* factors, the Court first considers whether Plaintiffs have shown "that there are 'serious questions going to the merits.'"[52] "Serious questions are ones that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation."[53] Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits."[54]

The NPRPA contains several provisions intended to protect surface resources during the development of petroleum reserves in the NPR-A. For example, 42 U.S.C. § 6506a(a)-(b), which provides for "an expeditious program of competitive leasing of oil and gas in the Reserve," also specifies that "activities undertaken pursuant to this section shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska[]." And § 6504(a) provides that:

Any exploration within the Utukok River, the Teshekpuk Lake areas,

---

[52] *Wild Swan*, 767 F.3d at 942 (quoting *Shell Offshore, Inc.*, 709 F.3d at 1291).

[53] *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (internal quotation marks omitted) (quoting *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023)).

[54] *Id.* (internal quotation marks omitted) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)).

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 12 of 17

Case 3:25-cv-00356-SLG    Document 38    Filed 01/27/26    Page 12 of 17

and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

"Putting those provisions together, [the Ninth Circuit has held that under the NPRPA] BLM ha[s] to ensure 'maximum protection' of significant surface values in the TLSA, and one way it could do that 'consistent with' the Reserves Act [is] by imposing 'conditions, restrictions, and prohibitions' seen as 'necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources' of the NPR-A."[55] In other words, "BLM can satisfy the Reserves Act's maximum-protection directive with mitigation measures that 'the Secretary deems necessary or appropriate.'"[56]  And, because § 6506a(b)—the "mitigation mandate"—is discretionary, "when it comes to mitigation measures, [courts] have less 'power to specify what the action must be.'"[57]  "[A court] must accord deference to the agency's mitigation measures," which "may be set aside only to the extent that they are arbitrary."[58]

In their reply, Plaintiffs maintain that BLM's reliance on ROP C-2 as modified in December 2025 to mitigate adverse effects and to maximally protect surface

---

[55] *Ctr. for Biological Diversity v. United States BLM*, 141 F.4th 976, 1002 (9th Cir. 2025) (quoting 42 U.S.C. §§ 6504(a), 6506a(b)).

[56] *Id.* (quoting § 6506a(b)).

[57] *Id.* at 1001 (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004)).

[58] *Id.* at 1003.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 13 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 13 of 17

resources in the exploration area is arbitrary because evidence available to BLM demonstrated that ROP C-2 would be ineffective.[59] Plaintiffs assert that the modified ROP C-2 continues "to define adequate snow cover as '6 inches average depth.'"[60] Plaintiffs maintain that it was "arbitrary for BLM to conclude that ROP C-2's six-inch average snow depth standard met BLM's Reserves Act obligation to mitigate effects in the face of the record showing that it is inadequate and that more protective measures are available."[61] Plaintiffs also assert that BLM violated the NPRPA because a six-inch average snow depth standard will not "prevent impacts from tundra travel," BLM failed "to include specific measures to avoid impacts from seismic camp moves," and "BLM failed to evaluate or apply measures that would have avoided impacts from tundra travel activities."[62] Plaintiffs state that BLM acknowledged that tundra travel likely would result in long-term impacts to the vegetation which, in Plaintiffs' view, "directly contradicts BLM's conclusion that impacts from the exploration program will be only 'temporary.'"[63]

The NPRPA does not require BLM to prevent *all* impacts to surface resources in the TLSA or elsewhere in the NPR-A.[64]    "BLM can satisfy the

---

[59] Docket 26 at 6; *see also* Docket 6 at 11.

[60] Docket 26 at 7 (quoting Docket 18-4 at 67).

[61] Docket 26 at 7; *see also* Docket 26 at 11.

[62] Docket 6 at 16-20.

[63] Docket 6 at 16-17 (quoting Docket 6-5 at 1); *see also* Docket 20-19 at 1.

[64] *See* Docket 20 at 24 ("Congress plainly did not expect exploration activities to leave no trace

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 14 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 14 of 17

Reserves Act's maximum-protection directive with mitigation measures that 'the Secretary deems necessary or appropriate.'"[65]  And, in reviewing the mitigation measures selected by BLM pursuant to § 6506a(b), "[a court] must accord deference to the agency's mitigation measures" which "may be set aside only to the extent that they are arbitrary."[66]

Here, BLM conducted a reasonably thorough analysis of the impacts of the Winter Program on tundra in the project area on various types of vegetation.  BLM concluded that it "expected impacts to vegetation would be minor and would be further minimized through applicable mitigation measures."[67]  ROP C-2, the measure on which Plaintiffs hang their claim for a preliminary injunction, not only prohibits off-road travel when the soil is insufficiently frozen and snow depth is on average less than 6 inches, but also requires that off-road travel generally use low-ground-pressure vehicles, prohibits bulldozing tundra mat and vegetation to construct trails or seismic lines, and requires that vehicles be selected and operated so as to eliminate direct impact on the tundra.[68]

As to camp moves, in the EA BLM reasoned that "[i]mpacts from seismic

---

and, yet, ConocoPhillips endeavors to do precisely that.").

[65] *Ctr. for Biological Diversity*, 141 F.4th at 1002 (quoting § 6506a(b)).

[66] *Id.* at 1003.

[67] Docket 18-4 at 64.

[68] Docket 18-3 at 65.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 15 of 17

Case 3:25-cv-00356-SLG    Document 38    Filed 01/27/26    Page 15 of 17

lines would be expected to be less compared to earlier studies as methodologies have greatly improved since the 1984-1985 seismic work" and while "[c]amp moves use equipment with similar ground pressures to that earlier exploration," "snow trail design and standards have improved."[69]  Further, contrary to Plaintiffs' claim, BLM did consider mitigation measures for camp moves, as the December 2025 EA explains that "ROPs for minimum snow depths and soil temperatures seek to minimize potential impacts from snow access routes, *camp moves* and seismic operations."[70]  Further, "[t]he Seismic Exploration camp would be moved every 2 to 6 days generally North to South through the project area depending on survey progress and regional conditions to help mitigate tundra impacts."[71]

Considering the NPRPA's directives and the record in this case, and in light of the deference owed to BLM in selecting mitigation measures that it deems are necessary or appropriate, the Court finds that Plaintiffs have not shown that they have a fair chance of success on the merits regarding their claim that BLM's chosen mitigation measures for the 2026 Winter Exploration Program, and particularly ROP C-2, are arbitrary and in violation of the NPRPA.  Because the Court finds that Plaintiffs have failed to satisfy at least one of the *Winter* factors, the Court declines to address the other *Winter* factors.

---

[69] Docket 18-4 at 64.

[70] Docket 18-4 at 16 (emphasis added).

[71] Docket 18-4 at 34.

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 16 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 16 of 17

**CONCLUSION**

In light of the foregoing, Plaintiffs' Motion for Preliminary Injunction at Docket 6 is DENIED.

DATED this 27th day of January, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:25-cv-00356-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. Burgum, et al.*
Order on Motion for Preliminary Injunction
Page 17 of 17

Case 3:25-cv-00356-SLG     Document 38     Filed 01/27/26     Page 17 of 17